UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

CELSIUS NETWORK INC., a corporation,
CELSIUS NETWORK LLC, a limited liability
company, CELSIUS NETWORKS LENDING
LLC, a limited liability company, CELSIUS
LENDING LLC, a limited liability company,
CELSIUS KEYFI LLC, a limited liability
company, CELSIUS MINING LLC, a limited
liability company, CELSIUS US HOLDING LLC,
a limited liability company; CELSIUS US LLC, a
limited liability company; CELSIUS
MANAGEMENT CORP., a corporation;

ALEXANDER MASHINSKY, individually and
as an officer of Celsius Network Inc., Celsius
Network LLC, Celsius Networks Lending LLC,
Celsius Lending LLC, Celsius KeyFi LLC,
Celsius Mining LLC, and Celsius US Holding
LLC;

SHLOMI DANIEL LEON, individually and as an
officer of Celsius Network Inc., Celsius Network
LLC, Celsius Networks Lending LLC, Celsius
Lending LLC, Celsius KeyFi LLC, Celsius
Mining LLC, Celsius US Holding LLC; and

HANOCH "NUKE" GOLDSTEIN, individually
and as an officer of Celsius Network LLC and
Celsius Lending LLC,

     Defendants.

**Case No. 1:23-cv-6009**

**COMPLAINT FOR PERMANENT
INJUNCTION, MONETARY
RELIEF, AND OTHER RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 5(a), 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b) and 57b, and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6821 *et seq.*, which authorize the FTC to seek, and the Court to order, monetary relief, preliminary and permanent injunctive relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the GLB Act. Defendants' violations are in connection with the marketing and sale of cryptocurrency lending and custody services.

## SUMMARY OF CASE

2.      Celsius[1] is a cryptocurrency company that marketed and sold crypto-based financial services to consumers. Celsius's products included interest-bearing cryptocurrency accounts, cryptocurrency-secured loans, and over-the-counter cryptocurrency sales, among other services.

3.      From at least 2019 until June 2022, Defendants duped consumers, many of whom were inexperienced with cryptocurrency, into transferring their cryptocurrency assets onto the Celsius platform. Defendants promised consumers that Celsius was "safer" than a bank or other traditional financial institution and misrepresented that their deposits were safe because Celsius earned profits at "no risk" to consumers by making secured crypto loans to other exchanges. Defendants guaranteed that if consumers transferred cryptocurrency to Celsius, they would

---

[1] Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Keyfi LLC, Celsius US Holding LLC, Celsius Mining LLC, Celsius US LLC, and Celsius Management Corp. are collectively referred to herein as "Celsius."

continue to own it, and they could withdraw it "at any time" because Celsius had "billions of dollars in liquidity" and maintained sufficient reserves to meet customer obligations.

4.      In reality, Defendants squandered consumer deposits, including by engaging in uncollateralized and undercollateralized lending despite their promises to the contrary. Defendants also failed to keep track of how much consumers had deposited and what Celsius's liabilities were. They failed to maintain enough liquid cryptocurrency to allow all customers to withdraw their crypto on demand. Defendants concealed these facts from the public and falsely touted Celsius as a safe alternative to banking—even though it was anything but.

5.       Defendants made other misrepresentations to market Celsius's services, too. In addition to misrepresenting Celsius's ability to satisfy obligations to customers, Defendants falsely advertised that a $750 million insurance policy covered consumers' assets. And, Defendants enticed consumers to deposit their cryptocurrency into Celsius's "Earn" program by claiming that consumers could earn "up to 17%" or "up to 18.63% APY" on deposits. In truth, more than 99% of Celsius's consumers earned APY far lower than 17%, with the average Celsius consumer receiving only about 5.611% APY.

6.      Throughout Celsius's operation, Defendants assured consumers Celsius was safe and stable. Then, on June 12, 2022, just five days after promising consumers that it "ha[d] the reserves (and more than enough ETH) to meet obligations," Defendants unexpectedly and unilaterally halted all withdrawals from and transfers on the platform, leaving hundreds of thousands of consumers without access to approximately $4.7 billion dollars' worth of crypto.

7.      On July 13, 2022, Celsius Network LLC and certain of its affiliates declared bankruptcy. The cases are pending in the U.S. Bankruptcy Court for the Southern District of

New York and are being jointly administered under Case No. 22-10964, *In re Celsius Network LLC*.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

10.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the GLB Act, which prohibits any person from using a false, fictitious, or fraudulent statement to obtain or attempt to obtain the customer information of a financial institution from a customer of a financial institution.

## DEFENDANTS

11.      Defendant Celsius Network Inc. ("CNI") is a Delaware corporation with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CNI transacts or has transacted business in this District and throughout the United States. CNI is the parent company for entities that operate the Celsius Network platform; CNI's subsidiaries include Defendants Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, Celsius Management Corp.,

3

and Celsius KeyFi LLC. At times relevant to this Complaint, acting alone or in concert with others, CNI has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

12.     Defendant Celsius Network LLC ("CNLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CNLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CNLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

13.     Defendant Celsius Networks Lending LLC ("CNLLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CNLLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CNLLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

14.     Defendant Celsius Lending LLC ("CLLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CLLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CLLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

15.     Defendant Celsius Mining LLC ("CMLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CMLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CMLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

16.     Defendant Celsius US Holding LLC ("CUSHLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CUSHLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CUSHLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

17.     Defendant Celsius US LLC ("CUSLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CUSLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CUSLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

18.     Defendant Celsius Management Corp. ("CMC") is a Delaware corporation with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CMC transacts or has transacted business in this District and throughout the United States. At times

5

relevant to this Complaint, acting alone or in concert with others, CMC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

19.    Defendant Celsius KeyFi LLC ("KeyFi") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. KeyFi transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, KeyFi has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

20.    Defendant Alexander Mashinsky ("Mr. Mashinsky") is a co-founder of Celsius. He has served as a director of Celsius Network Inc. He was the Chief Executive Officer of Celsius Network LLC from its inception until September 27, 2022. He also served as CEO of Celsius US Holding LLC, Celsius Lending LLC, Celsius Networks Lending LLC, and Celsius Network Inc., as well as Executive Chairman of the Board for Celsius Mining LLC and Secretary of Celsius Network, Inc. He was also a director of Celsius KeyFi LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Lending LLC, Celsius US Holding LLC, and Celsius Networks Lending LLC from their inception until September 27, 2022. Acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Celsius, including the acts and practices set forth in this Complaint. Mr. Mashinsky has served on various committees within Celsius including the Executive Committee, Assets and Liability Committee, Risk Committee, Assets and Obligations Committee, Investment Committee, and Deployment Committee. He had a heavy hand in Celsius's marketing efforts. He routinely made false, misleading, and/or unsubstantiated

6

statements regarding Celsius's products and services in weekly marketing videos displayed on Celsius's official YouTube channel, as well as on his personal Twitter account. He was also personally involved in the decision to freeze withdrawals, swaps, and transfers from the Celsius platform. Mr. Mashinsky resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

21.     Defendant Shlomi Daniel Leon ("Mr. Leon") is a co-founder of Celsius. He is a director of Celsius Network Inc. He served as the Chief Strategy Officer of Celsius Network LLC until October 4, 2022. He has also served as Chief Operating Officer for Celsius Network LLC, CSO of Celsius Lending LLC, President of Celsius Mining LLC, and COO of Celsius Network Inc. He has served as a director of Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Networks Lending LLC, and Celsius US Holding LLC. Acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Celsius, including the acts and practices set forth in this Complaint. He has served on numerous committees within Celsius, including the Executive Committee, Assets and Liability Committee, Risk Committee, Assets and Obligations Committee, and Investment Committee. Mr. Leon was involved in and oversaw the crafting of advertisements about Celsius's products and services, and participated in the decision to freeze withdrawals, swaps, and transfers from the Celsius platform. Mr. Leon, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

22.     Defendant Hanoch "Nuke" Goldstein ("Mr. Goldstein") is a co-founder of Celsius. He served as Chief Technology Officer of Celsius Network LLC and Celsius Lending

LLC until March 21, 2022, and served as President of Labs for Celsius Network LLC. Acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Celsius, including the acts and practices set forth in this Complaint. He has served on the Executive Committee and Risk Committee. Mr. Goldstein actively participated in Celsius's marketing, appearing in advertising videos displayed on Celsius's official YouTube channel. Mr. Goldstein resides in Florida and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

23.     Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius US Holding LLC, Celsius Mining LLC, Celsius Lending LLC, Celsius US LLC, Celsius Management Corp., and Celsius KeyFi LLC (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds and property, including digital assets. Because these Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

**COMMERCE**

24.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**BACKGROUND ON CRYPTOCURRENCY**

25.     Cryptocurrencies are digital assets that exist on a technology called a blockchain, a type of electronic ledger.

26.      There are thousands of different cryptocurrencies, sometimes called "coins" or "tokens," in existence today. Common cryptocurrencies include Bitcoin (BTC) and Ethereum (ETH). Most cryptocurrencies are not issued or created by any government or centralized banking institution.

27.     Cryptocurrency companies have invested heavily in marketing in recent years. For example, one cryptocurrency exchange announced a $100 million advertising campaign in 2021, and another spent $20 million for an advertising spot in the 2022 U.S. Super Bowl. Cryptocurrency ads often feature popular celebrities and well-known athletes. These advertising efforts have been successful: Roughly three-quarters of those who have ever invested in, traded, or used cryptocurrency say they did so for the first time within the past five years.

28.     As consumer interest in cryptocurrency has risen, so have scams and frauds involving cryptocurrencies. Since 2021, consumers have reported over $1.6 billion dollars' worth of losses to cryptocurrency-related scams. And 2022 saw the total collapse of certain cryptocurrencies, including so-called stablecoins, and popular cryptocurrency exchanges.

## **DEFENDANTS' BUSINESS ACTIVITIES**

29.     Founded in 2017, Celsius is a cryptocurrency financial services provider that has marketed a variety of cryptocurrency products and services to consumers. In 2018, Celsius launched the Celsius mobile app and issued its own proprietary cryptocurrency, the CEL token.

30.     Celsius has marketed a number of financial services that consumers are accustomed to encountering in the traditional financial marketplace, including interest-bearing accounts, personal loans, and currency exchanges. Celsius's services have included an Earn program that promises "rewards" (annual percentage yield or "APY") on deposits of cryptocurrency assets; a Borrow program that allows customers to take out loans secured by their crypto deposits; a Custody program that allows customers to store their crypto on the Celsius platform without earning yield; and other services that allow customers to exchange ("swap") cryptocurrency, buy cryptocurrency, or transfer assets to other Celsius users. Celsius also operates a Bitcoin mining enterprise.

31.     Since at least 2019, Defendants have promoted Celsius as a cryptocurrency-based alternative to banks—a safer place to store assets than a bank, and which supposedly always acted in its "depositors'" "best interests."  Mr. Mashinsky made many of these representations independently. Defendants have used slogans like "Banks are not your friends" and "Unbank Yourself" to position Celsius favorably relative to banks. Defendants repeatedly asserted that banks could not be trusted with consumers' hard-earned money, while Celsius was "telling you the truth" and "being transparent all the time." (Mr. Mashinsky personally made these statements in a 2021 AMA, accompanied by Mr. Goldstein.) Defendants also claimed that Celsius was a better place for consumers to store their assets because "we have less risk, we have much less

risk" than banks. Mr. Mashinsky even told consumers that "a run on the bank"—referring to a scenario in which mass consumer withdrawals deplete a bank's available capital and cause it to collapse—"cannot happen at Celsius."

32.     Defendants relied on digital advertising and social media to market Celsius's products and services and persuade consumers to deposit their cryptocurrency onto the Celsius platform. One of Celsius's most prominent advertising channels was its collection of "Ask Mashinsky Anything" ("AMA") videos, in which Mr. Mashinsky (and other Celsius employees, including Mr. Leon and Mr. Goldstein) advertised Celsius's products, responded to viewer questions, discussed the crypto market, and touted Celsius's purported superiority over other financial institutions and crypto companies. As of June 2022, Mr. Mashinsky had recorded 179 AMA episodes, many of which were an hour or more long and each of which was seen by thousands of viewers. Many of the AMAs were posted on Celsius's website and on its YouTube channel, where they remain accessible for public viewing today. Mr. Mashinsky, Mr. Goldstein, and Mr. Leon also used their own personal social media accounts to promote and market Celsius's products and services.

**I.     Defendants have misrepresented Celsius's products and services.**

33.     Defendants have made a number of misrepresentations about the benefits of using Celsius services and the safety of consumer funds. Specifically, Defendants have claimed that: (1) Celsius did not make unsecured loans; (2) Celsius maintained sufficient liquid crypto assets to satisfy its consumer obligations; (3) consumers could withdraw the cryptocurrency they deposited at any time; (4) Celsius maintained a $750 million insurance policy for consumer deposits; and (5) consumers could earn "up to 17% APY" and "up to 18.63% APY." Each of

these claims was false or unsubstantiated at the time it was made.

**A.    Defendants claimed that Celsius did not make unsecured loans.**

34.    According to Defendants, one reason Celsius was safer than a traditional bank was because Celsius could supposedly earn yield "without taking any risk . . . or taking minimal risk." Defendants claimed Celsius earned this no-risk revenue by lending out deposited cryptocurrency via secured loans to highly vetted counterparties at favorable interest rates. According to Defendants, the loans to third parties were low- or no-risk because they were secured by cryptocurrency or other assets held by Celsius, which Celsius could liquidate if the borrower were to default. Defendants promised consumers that their deposits would be lent out only via "100% collateral" and denied engaging in "unsecured" lending to generate revenue.

35.    In a 2020 AMA, Mr. Mashinsky, accompanied by Mr. Leon, claimed that Celsius did not "do non-collateralized loans . . . because that would be taking too much risk on your behalf." In fact, in July 2020, Celsius had approximately $160,000,000 in unsecured loans.

36.    In a 2021 AMA, Mr. Mashinsky told viewers that "we only do asset back[ed] lending meaning you have to give us an asset like crypto or things that we accept." Yet as of August 2021, nearly half of Celsius's institutional lending portfolio (over $700 million) was unsecured.

37.    In another 2021 AMA, Mr. Mashinsky falsely claimed that "we don't treat businesses or individuals differently" in issuing loans, meaning that both businesses and individuals were required to post collateral. Internally, Celsius employees complained that "we absolutely do" treat institutional counterparties differently from individuals, because Celsius made unsecured institutional loans. Yet only two weeks later, Mr. Mashinsky and another AMA

guest both claimed, again, that Celsius made all its institutional counterparties post collateral.

38.     In a 2021 AMA, a Celsius employee claimed that "the majority of our loans, almost 100% of them are fully collateralized, with other assets." And in April 2022, Mr. Mashinsky told a CNBC reporter that "we do not offer any non-collateralized loans." In fact, Celsius had over $1.2 billion uncollateralized loans outstanding.

39.     Consumers believed Celsius. Multiple consumers have told the bankruptcy court that they relied on Defendants' promises that "all loans are overcollateralized." As one consumer told the Bankruptcy Court, "I initially signed up with Celsius due to the advertised fact that you could earn interest in crypto with minimal risk through over-collateralized loans . . . The advertising campaigns, weekly AMAs, website, and interviews all are adamant that our funds are used in over-collateralized loans to generate yield for the depositors."

40.     Contrary to its representations to consumers, Celsius routinely made unsecured loans that gave Celsius no ability to seize collateral should the counterparty default.

41.     By June 2022, Celsius had lost over $60 million due to unsecured and under-secured lending.

42.     Internally, Celsius employees acknowledged that the promises that Celsius made only collateralized loans were false, and that Mr. Mashinsky was a "liar" for claiming that "we do not do unsecured lending." Yet Defendants continued to misrepresent how Celsius earned revenue and concealed its actual practices from the public.

**B.    Defendants assured customers that Celsius maintained sufficient reserves to meet customer obligations.**

43.    Defendants promised consumers that Celsius would always have sufficient liquid crypto reserves to meet customer obligations.

44.    Defendants told consumers that the assets on its balance sheet guaranteed the safety of customer deposits and availability of withdrawals. For example, in 2021, Mr. Mashinsky claimed that because "Celsius has over two billion dollars on its balance sheet . . . there is no safer place to give your coins to loan." Goldstein, who also appeared in the video, nodded in agreement. Mr. Mashinsky also told consumers that Celsius always had "enough liquidity on the sidelines . . . enough liquidity on hand" to satisfy consumer obligations. In 2022, Mr. Leon helped craft a blog post falsely stating that Celsius had more than enough reserves to meet its obligations.

45.    Consumers believed Celsius. Dozens of consumers have stated that Celsius's representations about its crypto reserves were an important factor in their decision to deposit crypto with Celsius. As one consumer put it, "[Mr. Mashinsky] reiterated time and time again on Twitter and on these AMAs that the company was over collateralized and that should anything go wrong they have more than enough money to make all depositors whole." Another consumer spent "100+ hours listening to Mr. Mashinsky and the communication of the company . . . every week for over a year: The worst thing that can happen is that everyone gets their coins back,' 'we have 2 billion dollars on our balance sheet so there is zero risk in depositing your crypto on Celsius . . . ."

46.    In fact, Celsius did not maintain sufficient liquid cryptocurrency reserves to satisfy consumer obligations. Rather than maintaining "enough liquidity on hand" to ensure that

all consumers could withdraw their crypto deposits if needed, Defendants maintained only a small capital reserve that would have allowed a fraction of its customers to withdraw their crypto within one week.

**C.    Defendants promised consumers that they could withdraw "at any time."**

47.    Between at least 2019 and June 2022, Defendants claimed that customers could withdraw their deposited cryptocurrency "at any time." Defendants claimed that customers would "always" have access to their cryptocurrency deposits and could withdraw them "whenever."

48.    Celsius's website and blog promised consumers that they could "Access your coins whenever, keep them safe forever" and "withdraw your crypto at any time":



15

49.     Defendants' marketing emails also promised that consumers could withdraw at will, promising in one: "Deposit any amount of crypto and feel good knowing you can withdraw at anytime without fees or penalties!"

50.     Defendants amplified these promises of on-demand withdrawals in Mr. Mashinsky's weekly AMA videos. Over and over, Mr. Mashinsky promised that anyone who deposited cryptocurrency with Celsius could "always" retrieve those deposits. According to Mr. Mashinsky, the "big benefit" of Celsius was that "you can withdraw at any time." He promised viewers that, "With Celsius, you can withdraw as much as you want as often as you want. No limits." Mr. Mashinsky even encouraged consumers to test Celsius by "pull[ing] out any assets you want five minutes after you put them in because you change your mind." In a 2021 tweet, he promised that "All coins are returned to their owners even in the case of bankruptcy."

51.     Consumers believed Celsius. Defendants told consumers "in plain English dozens (if not hundreds) of times that we would be able to withdraw OUR crypto whenever we wanted to," and consumers listened. One consumer told the bankruptcy court, "I chose to park my crypto there because I could withdraw at any time versus [a competitor] where they lock up your crypto . . . . [W]atch the AMA videos and you will see why we all believed."

52.     In fact, contrary to its promises, consumers could not "withdraw at any time" because Celsius did not maintain sufficient liquidity to allow everyone to withdraw on demand.

53.     Much of Defendants' assets, like Bitcoin mining equipment and stock in Bitcoin mining companies, could not quickly be converted into cryptocurrency for withdrawals. Other assets, like Celsius's proprietary CEL token, were highly volatile and illiquid, without a guaranteed market for sale.

54.     In addition, many of Celsius's deployment strategies required digital assets to be posted as collateral, "staked" (i.e., posted on the Ethereum blockchain to validate transactions, meaning that it could not be accessed for lengthy periods), or otherwise locked up and inaccessible to Celsius for significant periods of time. This meant that, even where Celsius *owned* assets equivalent to the assets consumers sought to withdraw, those assets might not be available for withdrawals. To access these illiquid cryptocurrency assets, Celsius was required to "unwind" transactions with institutional counterparties—a process that could take several days.

55.     Further, although Celsius promised consumers that it had crypto available for them to withdraw, in fact, Defendants did not even know what Celsius owned and what it owed. Defendants did not track Celsius's available assets or its consumer liabilities.

56.     Until 2021, Celsius did not use any system for monitoring movement of cryptocurrency assets to and from its platform. Nor did Celsius have any policy or procedure for ensuring that Celsius had assets available to satisfy consumer demands. In mid-2021, Celsius began using spreadsheets to track its assets and liabilities (most of which were consumer deposits). Celsius employees updated the spreadsheets manually. There was no standard process for updating the spreadsheets at regular intervals and no system for ensuring their accuracy. As a result, the spreadsheets were often inaccurate and frequently overstated Celsius's assets.

57.     Internally, Celsius employees acknowledged that its own internal financial statements were inadequate and could not be trusted, yet Defendants continued to assert that Celsius could satisfy consumer withdrawals.

**D.    Defendants claimed consumers' crypto deposits were insured.**

58.    In 2022, Defendants also advertised that it had $750 million of insurance on consumer deposits.

59.    Defendants acquired GK8 LLC, a company that specialized in custody solutions for digital assets. In multiple AMAs, Mr. Mashinsky promised consumers that GK8 had a $750 million insurance policy for deposited crypto assets, which would benefit Celsius customers. He told consumers that GK8 was "the only one in the world, as far as I know, that has [a] $750 million insurance policy from Aon." He also told consumers that GK8 offered "$750 million insurance per client," and on another AMA on April 22, 2022, a Celsius employee told viewers that GK8 offered "$750 million dollars of insurance per account."

60.    In or around June 2022, Defendants updated Celsius's website to advertise "$750M in insurance."

61.    Consumers believed Celsius. For example, in Celsius's bankruptcy proceedings, one consumer stated in a sworn declaration that he considered the claim of $750 million in insurance when deciding to keep his assets on the Celsius platform in 2022.

62.    In fact, neither Celsius nor its former subsidiary GK8 purchased or maintained a $750 million insurance policy.

**E.    Defendants advertised that Earn accounts could yield "Up to 17% APY."**

63.    Defendants also misled consumers by marketing high yields on cryptocurrency deposits. Celsius's primary product was its "Earn" program, which Celsius marketed as an interest-bearing deposit account. Defendants promised consumers that they would earn significant "rewards" (annual percentage yield or "APY") in exchange for depositing

cryptocurrency with Celsius. Once consumers transferred cryptocurrencies onto the Celsius platform, rewards appeared weekly as a deposit into the users' Earn account balance.

64.     Defendants posted yield rates for different cryptocurrencies on its website, highlighting the rates in prominent text. For example, in early 2022 Celsius declared on its homepage that consumers could "Earn up to **17% APY** on your crypto":



65.     In spring 2022, Defendants boosted Celsius's advertised rewards to over 18%:

66.     Despite Defendants' promises, over 99% of Celsius customers never earned APY of 17%. In fact, the median APY was around 4.9% and the average was only about 5.611%. During the periods that Celsius advertised APY up to 17% or more, less than 1% of Celsius customers actually earned rewards of 17%.

67.     Unbeknownst to consumers, Celsius did not offer the promised APY on the best known and most-used cryptocurrencies, Bitcoin and Ether. APYs of 17% and 18.63% were available only on a handful of lesser-known cryptocurrencies, sometimes called "alt-coins," even though the majority of Celsius users deposited Bitcoin and Ether, not alt-coins.

68.     Further, the highest promised APYs were available only to customers who were enrolled in Celsius's CEL Loyalty Program—a program that required users to purchase a certain amount of Celsius's own CEL token, which had limited use outside of the Celsius platform.

## II.     Celsius used its misrepresentations to entice consumers to hand over their financial information.

69.     Celsius has used the misrepresentations set forth above to obtain or attempt to obtain consumers' sensitive personal and financial information.

70.      To use Celsius's products and services, consumers had to sign up for a Celsius account and provide personal information like social security number and a copy of a government-issued identification. Only after registering could consumers transfer cryptocurrency from their own digital wallet into their Celsius account and gain access to various services. In many instances, Celsius obtained consumers' bank account information, and when consumers transferred cryptocurrency to the Celsius platform, Celsius gained access to identifying information for the wallet from which the cryptocurrency was sent.

**III.     Defendants misappropriated consumers' cryptocurrency deposits.**

71.     As soon as consumers deposited their assets into the Earn program, rather than ensuring the cryptocurrency would remain "yours legally" and "safe forever," as promised, Defendants took title to consumers' cryptocurrency and then transferred deposits into Celsius's pooled omnibus account, without any way to trace coins back to the consumer who deposited them, having deposits insured, maintaining reserves, or taking any step to keep them "safe forever." Celsius then used consumers' cryptocurrency to pay its bills, to fund ongoing operations, to pay rewards to other Earn consumers, and to stake or pledge as collateral. Celsius also used these coins to make high-risk investments and, admittedly, "lost too many times."

72.     Without title to their deposits, consumers became unsecured creditors, with no greater claim to their cryptocurrency than Celsius's landlords or service providers with unpaid bills. Additionally, consumers who deposited cryptocurrency into the Earn program lost the right to demand return of their cryptocurrency in-kind: those consumers now own just an IOU from Celsius, not the underlying coins, and thus—if they get paid back at all—risk receiving something different than what they deposited.

73.     Consumers had no reason to anticipate that Celsius would take legal ownership of their property. Indeed, Celsius told consumers the opposite: that deposits of crypto were "yours legally." Mr. Mashinsky claimed that, "Whatever you put in, if you put in one Bitcoin you will be withdrawing one Bitcoin. . . . It's always your Bitcoin. Always your Ether. Always your CEL token." As one consumer put it, "Celsius has stated on multiple occasions 'your coins' when referring to Celsius'[s] depositors['] crypto assets. . . . Myself and any other users were under the impression, from these verbal statements, that users' coins remained theirs . . . ."

21

74.     Because Defendants spent consumers' cryptocurrency for their own purposes and never maintained adequate liquidity to satisfy consumers' withdrawal requests, consumers often were unable to withdraw their assets when needed. In many instances, consumers reported being unable to withdraw their funds for days or even weeks—in direct contradiction to Celsius's widely touted claim that consumers could always withdraw "at any time." For example, in 2020, one consumer complained online about difficulties withdrawing, concluding: "10 working days have passed and no luck." Another consumer posted that their withdrawal request had been pending for 4 days, and someone responded that theirs had been pending for 6.

75.     Celsius's failure to satisfy consumers' withdrawal requests intensified in early 2022. By April 2022, high-level Celsius employees expressed concern that Celsius lacked sufficient liquidity to meet customer demands. By May, Celsius was insolvent. Celsius's top executives, including Mr. Mashinsky, Mr. Leon, and Mr. Goldstein, were aware that Celsius's "capital sits near zero" and that Celsius was having trouble satisfying customer withdrawal requests. Celsius customers seeking to withdraw their deposited cryptocurrency faced significant delays as Celsius employees scrambled to unwind agreements with counterparties and retrieve coins that Celsius had deployed. Consumers were harmed when they could not access the cryptocurrency deposits they had entrusted to Celsius—including life savings, college funds, and money saved for retirement.

76.     Yet Defendants concealed these financial realities from consumers, insisted that Celsius was stronger than ever, and doubled down on their promises that deposited assets were "safe" and consumers could withdraw cryptocurrency deposits on demand.

77.     For example, on May 11, 2022, Mr. Mashinsky tweeted that "all funds are safe."

78.     On May 13, 2022, Mr. Mashinsky told AMA viewers that "Celsius is stronger than ever, we have billions of dollars in liquidity . . . and we continue to do what Celsius does best – serve the community, protect the community, make sure your assets are there when you need them."

79.     On May 27, 2022, Mr. Mashinsky told AMA viewers that it was "business as usual" at Celsius. The next day, Mr. Goldstein tweeted that "the Celsius community, company, and staff are strong as always . . . ."

80.     Defendants encouraged consumers to leave their deposits on the platform. In an early June AMA, Mr. Mashinsky urged consumers to "HODL," meaning "hold on for dear life" (and leave your assets on the platform). He promised that Celsius had "figured out how to make money for all of us while you HODL."

81.     Defendants also continued to solicit *new* customers based on its misleading claims of financial stability. Consumers created thousands of new accounts in May 2022 and deposited millions of dollars' worth of new cryptocurrency with Celsius.

82.     In a blog post published June 7, 2022, on Celsius's official blog, which Mr. Leon helped craft, Defendants bragged, "Damn the torpedoes, full speed ahead." In the post, Defendants promised consumers that "Celsius continues to process withdrawals without delay. We have not had any issues meeting withdrawal requests." Celsius also claimed that "Celsius has the reserves (and more than enough ETH) to meet obligations." These statements were false, but Mr. Leon and Mr. Goldstein retweeted the June 7, 2022 blog post from their personal Twitter accounts.

23

83.     On June 10, 2022, Mr. Mashinsky claimed in an AMA that "Celsius has billions in liquidity . . . and we provide immediate access to everybody, anyone who needs access to it." He further stated that "Anyone who wants to withdraw has no problem, right."

84.     On June 11, 2022, he tweeted that the idea that Celsius was having trouble processing withdrawals was "FUD [Fear, Uncertainty, and Doubt] and misinformation." He went on to challenge his followers to find "even one person who has a problem withdrawing from Celsius." One incredulous consumer emailed Celsius in response to this tweet: "I found it ironic to dare the media to 'find one person who could not withdraw.' As a reminder, I have had issues for weeks that are still not resolved and which have prohibited me to withdraw my funds!"

85.     Then, on June 12, despite all of Defendants' promises that Celsius had "billions in liquidity" and provided "immediate access to everybody," Defendants chose to shut down consumers' ability to withdraw funds from the platform completely.

86.     Users who had pending withdrawal requests had their requests denied, and no new withdrawal requests were honored. Users with crypto-secured loans could not access their collateral (even if they paid off their loans entirely) or transfer funds within the platform to avoid margin calls or liquidation.

87.     Although Defendants claimed the freeze was a temporary measure intended to "stabilize liquidity," Defendants never resumed withdrawals. Instead, Celsius filed for bankruptcy on July 13, 2022. At that point, Celsius had over $4.7 billion in user liabilities. As one consumer lamented in a letter to the bankruptcy court, "I should have the opportunity to make appropriate fund transfers (all held by Celsius) to pay off the loan principle in kind (my

collateral, BTC). This was the agreement. However, because ALL my assets held with Celsius are frozen, hostage, it leaves me with no options that I can trust. They have seized everything."

88.     Consumers were surprised and devastated by these harsh and unexpected developments. Consumers responded to Celsius's decision to freeze their accounts by begging Celsius to restore access to life savings and assets that they expected to be able to live off of based on Defendants' representations.

89.     One customer wrote to Celsius, "Why was there no warning about this? We've been told until now that everything was ok and whoever says otherwise is a hater spreading misinformation. Now, without warning, I no longer have access to money I depend on, with no idea when/if that changes."

90.     Another wrote: "You told the entire community that we could withdraw whenever. My life savings are on that account."

91.     Tellingly, Mr. Mashinsky, Mr. Leon, and Mr. Goldstein each withdrew significant sums of crypto from Celsius in April and May 2022 before freezing consumers' accounts. Privy to the information that Celsius was headed for insolvency, these insiders acted upon this fact to protect their assets while simultaneously lying to customers to prevent them from being able to do the same. For example, as of April 4, 2022, Celsius did not have enough liquid assets to meet its expected obligations. On April 13, Mr. Leon withdrew $2,200,000 of USDC. Mr. Leon also transferred 8,000,000 CEL tokens to an account owned by a limited partnership that he controlled. That same day, Mr. Leon's limited partnership posted 7,373,272 CEL tokens as collateral and received a $4 million USD loan. On May 14, 2022, members of the risk team described the liquidity crisis facing Celsius as "existential" and the measures they were taking to

increase liquidity as "only buying [Celsius] time." On May 15, 2022, Mr. Mashinsky withdrew BTC, ETH, and USDC worth $1,089,137. On May 27, 2022, Celsius triggered a reduced liquidity stress test, and on that same day, Mr. Mashinsky, via a company that he controlled, withdrew substantially all of his non-CEL token cryptocurrency—worth $5,120,317. On May 31, 2022, Mr. Mashinsky complained to employees that they had had "two weeks in a raw [sic] of slow/delayed withdrawals." But that same day, CEL tokens with a value of $2,027,339 were transferred into an account controlled by Mr. Mashinsky, and Mr. Leon withdrew BTC with a value of $423,376 without delay.

92.     But unlike these insiders, most consumers had no idea what was going on. Consumers had no expectation that Celsius would not only take title to their deposits, but would then use those deposits in a manner that risked consumers' ability to access their cryptocurrency later, including by failing to insure deposits or maintain sufficient reserves. Consumers, instead, could rely only on Defendants' promises that their cryptocurrency remained "yours legally," that their deposits were "safe," and that Defendants would "make sure your assets are there when you need them." In a June 1st interview, Mr. Mashinsky claimed, "not just that they [customers' coins] are safe but we provided anyone who wanted to withdraw partially or fully, there were no problems"—a blatant falsehood. Insiders were able to withdraw all of their coins pre-freeze while many consumers were left emptyhanded.

93.     Even after Celsius halted withdrawals, deposits continued. Consumers deposited nearly $20 million in cryptocurrency onto the Celsius platform in the two weeks following the shutdown of withdrawals.

*        *        *

94.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC. Among other things, Celsius's website still contains many of the misrepresentations set forth above. It still advertises APY up to 17% and claims that consumers should "trust" Celsius as an alternative to a bank. The official Celsius subreddit also advertises "up to 17% AOY on crypto." The website still links to YouTube videos containing misleading statements by Mr. Mashinsky and others marketing Celsius as a safe place to store cryptocurrency deposits. And consumers' funds are still frozen. Before leaving Celsius, Mr. Mashinsky proposed simply re-starting a new cryptocurrency custody venture that would put consumers' crypto deposits back in his hands. Further, Defendants engaged in the unlawful acts and practices above repeatedly over a period of at least three years. And, Mr. Mashinsky, Mr. Leon, and Mr. Goldstein maintain the means, ability, and incentive to resume their unlawful conduct.

## <u>VIOLATIONS OF THE FTC ACT</u>

95.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

96.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

97.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**Count I**

**Deception**

98.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of products and services offered through Celsius, including through the means described in Paragraphs 33 to 68 above, Defendants have represented, directly or indirectly, expressly or by implication, that:

(1) Celsius did not make unsecured loans;

(2) Celsius maintained sufficient liquid crypto assets to satisfy its consumer obligations;

(3) consumers could withdraw the cryptocurrency they deposited at any time;

(4) Celsius maintained a $750 million insurance policy for consumer deposits; and

(5) consumers could earn "up to 17% APY" and "up to 18.63% APY."

99.     The representations set forth in Paragraph 98 were false, misleading, or not substantiated at the time the representations were made.

100.     Therefore, the making of the representations as set forth in Paragraph 98 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**

**Unfairly Misappropriating Consumers' Cryptocurrency Deposits**

101.     In numerous instances, Defendants have misappropriated consumers' cryptocurrency deposits.

102.    Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

103.    Therefore, Defendants' acts or practices as set forth in Paragraphs 101 and 102 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

104.    Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

105.    The GLB Act defines "customer" to mean "with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary." 15 U.S.C. § 6827(1). The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of a financial institution and is identified with the customer." 15 U.S.C. § 6827(2).

106.    Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."

107.     Section 814(a) of the FDCPA, in turn, makes a violation of the FDCPA an unfair or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 1692l(a). Section 814(a) of the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the power to enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule.

108.     Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section 521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an FTC trade regulation rule.

109.     Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of FTC trade regulation rules. Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the GLB Act. This relief may include, and is not limited to, rescission or reformation of contracts, and the refund of money or return of property.

### Count III

**Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain Customers' Customer Information of a Financial Institution**

110.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of products and services offered through Celsius, Defendants have made false, fictitious, or fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain customer information of a financial institution. The customer information of a financial institution that Defendants obtain or attempt to obtain includes

consumers' bank account numbers and cryptocurrency wallet addresses.

111.    Defendants have obtained or attempted to obtain the customer information of a financial institution by soliciting consumer deposits onto the Celsius platform via representations to customers of financial institutions, directly or indirectly, expressly or by implication, that consumers could withdraw their cryptocurrency at any time, that Defendants maintained sufficient liquidity reserves to satisfy all consumer obligations, that customer deposits were insured, that Celsius did not engage in unsecured lending, that Celsius offered APY up to 17%, and that consumers retained ownership of their deposited cryptocurrency.

112.    Defendants' representations set forth in Paragraphs 110 and 111 above were false, fictitious, or fraudulent within the meaning of Section 521 of the GLB Act.

113.    Therefore, Defendants' acts and practices set forth in Paragraphs 110 to 112 above violate Section 521 of the GLB Act, 15 U.S.C. § 6821, and constitute deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## <u>CONSUMER INJURY</u>

114.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the GLB Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## <u>PRAYER FOR RELIEF</u>

Wherefore, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act and the GLB Act by Defendants;

B.      Grant preliminary injunctive and ancillary relief as may be necessary to avert the

likelihood of consumer injury during the pendency of this action and to preserve the possibility

of effective final relief;

C.      Award monetary and other relief within the Court's power to grant; and

D.      Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: July 13, 2023                       ___/s/ Katherine M. Aizpuru_____
                                           KATHERINE M. AIZPURU (Bar No. 5305990)
                                           STEPHANIE LIEBNER (*pro hac vice* forthcoming)
                                           KATHERINE WORTHMAN (*pro hac vice*
                                           forthcoming)
                                           Federal Trade Commission
                                           600 Pennsylvania Avenue NW
                                           Mail Stop: CC 6316
                                           Washington, D.C. 20580
                                           kaizpuru@ftc.gov
                                           sliebner@ftc.gov
                                           kworthman@ftc.gov
                                           202-876-5673

                                           *Attorneys for Plaintiff Federal Trade Commission*