UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------
FEDERAL TRADE COMMISSION,

          Plaintiff,

     -v-

RCG ADVANCES, LLC et al.,

          Defendants.
--------------------------------
```

20-cv-4432 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Plaintiff, the Federal Trade Commission ("FTC"), alleges that defendant Jonathan Braun led a scheme to defraud small businesses and to intimidate their owners. This alleged scheme centered on a financing arrangement called a "merchant cash advance" agreement ("MCA" Agreement). Co-defendant RCG Advances, LLC ("RCG") loaned a lump sum of cash to a customer; in exchange, the customer assigned its future receivables to RCG until the defendants collected an agreed-upon amount. The FTC alleges that Mr. Braun, both directly and through RCG, swindled customers by lying about many of the terms of these advances: the amount of cash RCG would loan, the amount of money RCG would collect, and whether the owners of RCG's customers would have to personally guarantee their debts. And when those customers fell behind on their payments, the FTC alleges, Mr. Braun would attempt to collect by making violent threats. This scheme, the FTC alleges, violated Section 5(a) of

1

the Federal Trade Commission Act ("FTCA"), as well as Section 521 of the Gramm-Leach-Billey Act ("GLB Act"). See First Amended Complaint ("FAC"), ¶¶ 33-55, ECF No. 84.

On April 8, 2022, the FTC moved for summary judgment on its claims against Mr. Braun. Since there is no genuine dispute of material fact on the essential elements of those claims, the Court hereby finds Mr. Braun liable on those claims (Counts I-V). The Court will also issue a permanent injunction. The Court, however, denies the FTC's motion for summary judgment on the amount of compensatory damages and civil penalties, as to which further proceedings will be necessary.

I.   Factual Background

It is undisputed that Mr. Braun and his co-defendants[1] (collectively, the "defendants") entered into MCA Agreements with small businesses, in which defendants provided these customers with upfront lump-sum amounts in exchange for the right to collect the customers' future receivables until defendants recouped a contractually specified amount of money. FTC Rule 56.1 Statement of Material Facts ("SMF"), ¶¶ 48, 54-55, 70, ECF No. 109-1.[2]

---

[1] The other defendants in this case, RCG, Ram Capital Funding LLC, Robert Giardina, and Tzvi Reich, settled with the FTC. See 1/5/22 Stipulated Order, ECF No. 102; 6/2/22 Stipulated Order, ECF No. 127.

[2] Except where indicated, the factual allegations set forth in this section are undisputed, for reasons explained below.

Specifically, the MCA Agreements contemplate that defendants would make daily debits of a specified amount from their customers' bank accounts until defendants recouped the entire amount that they were owed. Id. ¶ 56. More generally, the contractual agreements provide that customers would agree to permit direct debits and credits to their bank accounts, give information about their bank accounts, grant a lien on their properties, and sign "Affidavit[s] of Confession of Judgment." Id. ¶¶ 58-62, 64-65.

Mr. Braun "was an owner, manager, and officer of RCG" and exercised his authority to make decisions, establish policies, and determine employment practices for all the defendants. Id. ¶¶ 27-29, 31. Specifically, Mr. Braun played an extensive role in the formulation and implementation of the MCA Agreements. Mr. Braun negotiated the terms of those agreements, exercised his authority to "change the fees that consumers were required to pay in order to obtain financing," and had final authority to approve the terms of those agreements. Id. ¶¶ 34-38. Mr. Braun also exercised considerable control over the administration of the MCA Agreements. Mr. Braun would instruct the other defendants "to deposit funds into the bank accounts of one or more consumers," monitored whether customers missed payments, "made the ultimate decisions about how to service [d]efendants' advances," exercised the authority to determine how to handle missed payments, exercised the authority to declare a customer in default, and exercised

authority over the filing of confessions of judgment ("COJs") against customers. Id. ¶¶ 39-44.

There is evidence that Mr. Braun and his co-defendants regularly failed to adhere to the contractual terms of the MCA Agreements and required customers to agree to contractual terms that conflicted with representations that defendants made on their website. Defendants over-debited customers' bank accounts, withdrawing daily amounts even after the customer had fully repaid the amount that defendants were contractually owed. Id. ¶¶ 70-96. Additionally, even though defendants, on their website, represented that there was "no personal guaranty of collateral" that was required of the business owners and that there were "No Credit or Collateral Requirements," id. ¶ 97, in actuality, defendants required business owners to sign personal guaranties of their businesses' performance, agree to be held jointly and severally liable in the event of default, and sign COJs confessing to judgment in their personal capacities. Id. ¶¶ 98-101. Finally, even though defendants' website stated that "No Upfront Costs" would be charged to customers, in actuality, defendants regularly charged their customers for upfront costs by deducting fees from the contractually agreed upon, upfront lump-sum amount. Id. ¶¶ 104-31.

There is clear evidence that Mr. Braun and his co-defendants engaged in other unseemly business practices. Defendants would

execute and file COJs against customers without a contractual basis for doing so, causing undue emotional and financial hardship to businesses and their owners. Id. ¶¶ 132-42, 145-56. Often, those COJs would contain material misrepresentations. Id. ¶¶ 143-44, 147. Defendants also made threats against their customers in order to make collections, inflicting emotional and financial harms upon businesses and their owners. Id. ¶¶ 157-73. Finally, defendants made unauthorized daily withdrawals from their customers' accounts. Id. ¶¶ 174-89.

In light of this extensive misconduct, the FTC asserts five claims against Mr. Braun. Count One alleges Mr. Braun violated Section 5(a) of the FTCA by making false and/or misleading statements that the FTC alleges qualify as deceptive acts or practices. FAC, ¶¶ 36-38. Count Two alleges that Mr. Braun misused COJs and thus violated Section 5(a) of the FTCA by engaging in an unfair act or practice. Id. ¶¶ 39-41. Count Three similarly alleges that Mr. Braun engaged in an unfair act or practice, in violation of Section 5(a) of the FTCA, by threatening customers to induce them to make payments. Id. ¶¶ 42-44. Count Four alleges Mr. Braun made unauthorized withdrawals from customers' bank accounts, which is also an unfair act or practice that violates Section 5(a) of the FTCA. Id. ¶¶ 45-47. Finally, Count Five alleges Mr. Braun violated Section 521 of the GLB Act by making false statements to obtain customers' bank account information and then using that

information to over-withdraw funds from those customers' bank accounts. Id. ¶¶ 53-54. The FAC requests a panoply of remedies, including a permanent injunction, civil penalties for each violation of Section 521 of the GLB Act, and a refund of customers' money.

On April 8, 2022, the FTC moved for summary judgment on Mr. Braun's liability under Counts One through Five and sought monetary and injunctive remedies against Mr. Braun. FTC Mot. for Summ. J., ECF No. 109; FTC Mem. in Supp. of Summ. J. ("FTC Mem."), ECF No. 110. On May 13, 2022, Mr. Braun opposed the FTC's motion for summary judgment, cross-moved to amend his answer to add a statute of limitations defense, moved to withdraw his deemed admissions to the FTC's requests for admission, and moved the Court to accept his late-filed responses to the FTC's requests for admission. Def. Cross Mot., ECF. No. 114; Def. Mem. of Law in Opp'n to Mot. for Summ. J. and in Supp. of Cross-Mot. ("Def. Mem."), ECF No. 119. The FTC opposed Mr. Braun's request to withdraw his deemed admissions and to file late responses to the FTC's requests for admission. FTC Mem. of Law in Opp'n to Def. Mot. to Accept Late Filed Resps., ECF No. 123.

Mr. Braun's request to withdraw his deemed admissions and make late-filed responses to the FTC's request for admission was denied, but Mr. Braun was permitted to amend his answer to add a statute of limitations defense. See 6/13/22 Memo Endorsement, ECF

No. 135. Accordingly, all that remains to be resolved is whether, on the undisputed facts, the FTC is entitled to summary judgment on Counts One through Five and the remedies that are appropriate should the Court determine that summary judgment on liability is warranted.

II.  Discussion

   "Summary judgment is proper when, after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993); see also Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[3] "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. "Genuine issues of fact are not created by conclusory allegations." Heublein, 996 F.2d at 1461. In making its determination on summary judgment, the

---

[3] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

Court "view[s] the evidence in the light most favorable to the party opposing summary judgment, draw[s] all reasonable inferences in favor of that party, and eschew[s] credibility assessments." New York v. Mountain Tobacco Co., 942 F.3d 536, 541 (2d Cir. 2009).

As the moving party, it is the FTC's "burden to show that no genuine factual dispute exists." Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). However, Mr. Braun must show more than "[t]he mere existence of a scintilla of evidence in support of [his] position." Anderson, 477 U.S. at 252. He "must offer some hard evidence showing that [his] version of the events is not wholly fanciful." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005). "[A] nonmoving party's self-serving statement, without direct or circumstantial evidence . . ., is insufficient to defeat a motion for summary judgment." Walker v. Carter, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016).

A. Adverse Inferences and Deemed Admissions

Before turning to Mr. Braun's liability, the Court addresses two threshold issues. First, the Court determines whether it should draw certain adverse inferences that the FTC requests. Second, the Court determines how it should treat Mr. Braun's deemed admissions on summary judgment.

First, the Court will draw adverse inferences against Mr. Braun based on the invocation by his associates of their Fifth Amendment rights in depositions, investigative hearings, and

requests for admission. Under certain circumstances, the Court is permitted to draw adverse inferences against Mr. Braun based on co-conspirators or associated non-parties invoking the Fifth Amendment. See United States v. Dist. Council of N.Y.C. and Vicinity of United Bhd. Of Carpenters & Joiners of Am., 832 F. Supp. 644, 651-52 (S.D.N.Y. 1993); SEC v. Durante, No. 01 Civ. 9056, 2013 WL 6800226, at *10-*11 (S.D.N.Y. Dec. 19, 2013), report and recommendation adopted, No. 01 Civ. 9056, 2014 WL 5041843 (S.D.N.Y. Sept. 25, 2014), aff'd, 641 F. App'x 73 (2d Cir. 2016). In making that determination, the Court considers the following "non-exclusive factors": (1) "[t]he [n]ature of the [r]elevant [r]elationships"; (2) "[t]he [d]egree of [c]ontrol of the [p]arty [o]ver the [n]on-[p]arty [w]itness"; (3) "[t]he [c]ompatibility of the [i]nterests of the [p]arty and the [n]on-[p]arty [w]itness in the [o]utcome of the [l]itigation"; and (4) "[t]he [r]ole of the [n]on-[p]arty [w]itness in the [l]itigation." LiButti v. United States, 107 F.3d 110, 123-24 (2d Cir. 1997). At bottom, "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." Id. at 124.

The FTC requests that the Court draw adverse inferences based on certain employees of defendants -- Jose DaSilva, Miriam Deutsch, Christopher Kim, Ezra Mosseri, and Marcella Rabinovich -- invoking the Fifth Amendment during depositions and investigative hearings.

See Pl. Ex. 26, ECF No. 109-33; Pl. Ex. 29, ECF No. 109-36; Pl. Ex. 30, ECF No. 109-37; Pl. Ex. 31, ECF No. 109-38; Pl. Ex. 32, ECF No. 109-39. In the excerpts provided by the FTC, these employees made blanket assertions of their Fifth Amendment rights when asked anything about the corporate defendants, the employees' roles in the business, Mr. Braun's role in the business, the MCA Agreements, and the misconduct at the center of this case.[4] The Court finds that all the factors counsel in favor of drawing an adverse inference. These are employees of the corporate defendants, meaning their business bond made it "less likely the non-party witness would . . . render testimony in order to damage the relationship," LiButti, 107 F.3d at 123, and Mr. Braun effectively controlled the employees and the corporate defendants,

---

[4] DaSilva invoked the Fifth Amendment when asked about his involvement with the MCA Agreements, his interactions with customers, his interactions with Braun, Braun's role at the corporate defendants and in deals, and the actions that the FTC argues violated the FTCA and GLB Act. See Pl. Ex. 26. Deutsch similarly invoked the Fifth Amendment when asked about Braun's control over the defendants, how the MCA Agreements were administered, the fees that were charged, and the misconduct at the center of this case. See Pl. Ex. 29. Kim invoked the Fifth Amendment when asked about the business and identity of the corporate defendants, Braun's involvement and misconduct toward customers, and misconduct related to fees. See Pl. Ex. 30. Mosseri invoked the Fifth Amendment when asked about the business and his role, Braun's role, misconduct related to fees, and business practices related to the MCA agreements. See Pl. Ex. 31. Rabinovich invoked the Fifth Amendment when asked about the corporate defendants, Braun's role, the MCA agreements, and the declaring of defaults and issuance of COJs. See Pl. Ex. 32.

see SMF, ¶¶ 27-29, 31, 38-39, 41-44. These employees also faced civil and criminal exposure for their involvement in the same wrongdoing as Mr. Braun, so their "assertion of the privilege advances" both their interests and Mr. Braun's. See LiButti, 107 F.3d at 123. Finally, these employees had roles in the underlying misconduct at issue in this litigation. The Court will accordingly draw adverse inferences against Mr. Braun based on these employees' invocations of the Fifth Amendment.

The FTC also requests that the Court draw adverse inferences based on the invocation of the Fifth Amendment by Robert Giardina (one of Mr. Braun's co-defendants) in response to the FTC's requests for admission. See Pl. Ex. 5, ECF No. 109-7; Pl. Ex. 7, ECF No. 109-9. Mr. Giardina invoked his Fifth Amendment rights in response to every request for admission, which asked Mr. Giardina about the conduct the FTC alleges violated the FTCA and GLB Act, his control over defendants' website, and his authority and control over defendants. See Pl. Exs. 5, 7. Here, the factors that the Court must consider also counsel in favor of drawing an adverse inference. Mr. Giardina and Mr. Braun shared a bond of business, they are co-defendants in the same litigation so their interests are aligned, and Mr. Giardina played a central role in the misconduct at the center of this litigation. Although it is not clear how much control Mr. Braun exercised over Mr. Giardina, Mr. Braun's level of control over the defendants' business practices

in general renders this factor neutral in the analysis. The Court will therefore draw adverse inferences against Mr. Braun based on Mr. Giardina's invocations of the Fifth Amendment.

Second, the Court will adhere to Judge Kaplan's previous decision to not allow Mr. Braun to withdraw his deemed admissions or file his responses to the FTC's requests for admission.[5] Therefore, Mr. Braun's failure to respond to the FTC's requests for admission means those requests are deemed admitted. Fed. R. Civ. P. 36(a)(3), (b). Accordingly, the Court will consider those facts to be undisputed in analyzing the FTC's motion for summary judgment. See, e.g., Donovan v. Carls Drug Co., 703 F.2d 650, 651 (2d Cir. 1983), rejected on other grounds by McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988); Virga v. Big Apple Constr. & Restoration Inc., 590 F. Supp. 2d 467, 471 (S.D.N.Y. 2008) ("For purposes of summary judgment, matters admitted under rule 36(a) of the Federal Rules of Civil Procedure may be used for summary judgment under rule 56."); Broadcast Music, Inc. v. Prana Hosp., Inc., 158 F. Supp. 3d 184, 190 n.5 (S.D.N.Y. 2016); Funnekotter v. Agric. Dev. Bank of Zim., No. 13 Civ. 1917, 2015 WL 9302560, at *4 (S.D.N.Y. Dec. 17, 2015).

---

[5] This case was originally assigned to the Hon. Lewis A. Kaplan and was reassigned to the undersigned on October 27, 2022.

B. <u>Liability</u>

    a. <u>Count I: Deceptive Acts in Violation of Section 5 of the FTCA</u>

Section 5 of the FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The FTC must prove three elements to show a deceptive act or practice: "(1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." <u>FTC v. LeadClick Media, LLC</u>, 838 F.3d 158, 168 (2d Cir. 2016). "[I]ntent to deceive" is not required. <u>Id.</u> <u>See also</u> <u>FTC v. Moses</u>, 913 F.3d 297, 306 (2d Cir. 2019).

To show that representations, omissions, or practices were misleading to reasonable consumers, the misrepresentations, omissions, or practices must be assessed "as a whole;" however, "[c]onsumer reliance on express claims is presumptively reasonable." <u>See</u> <u>FTC v. Five-Star Auto Club, Inc.</u>, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000). <u>See also</u> <u>Murray Space Shoe Corp. v. FTC</u>, 304 F.2d 270, 272 (2d Cir. 1962) ("In deciding whether petitioner's advertising was false and misleading, we are not to look to technical interpretation of each phrase, but must look to the overall impression these circulars are likely to make on the buying public.").

"A claim is considered material if it involves information important to consumers and, hence, is likely to affect their choice of, or conduct regarding a product." FTC v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008). "Information concerning prices or charges for goods or services is [considered] material." FTC v. Crescent Publ'g Grp., Inc., 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001), and materiality is presumed for "[e]xpress representations that are shown to be false." Med. Billers Network, 543 F. Supp. 2d at 304. The FTC does not need to show "that every consumer actually relied upon the misrepresentation to prevail." Five-Star Auto Club, Inc., 97 F. Supp. 2d at 530.

The parties dispute whether the FTC must also show the deceptive act "is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." See 15 U.S.C. § 45(n). Mr. Braun cites a Second Circuit case that appears to endorse his position that this is an element of a deceptive act or practices claim, see LeadClick Media, 838 F.3d at 168; however, the Court finds that discussion there was dicta and therefore not binding on this Court. At issue in LeadClick Media was not whether Section 5(n) applies to a deceptive act claim; indeed, the appellant in that case conceded that "its affiliates engaged in false and deceptive advertising practices." Instead, the issue in that case was whether appellant could be

held liable under Section 5 for its participation in the deceptive scheme. Id. at 168-72. Further illustrating this was dicta, when the Second Circuit restated the standard for a deceptive act claim under Section 5, in 2019, any reference to Section 5(n) was conspicuously absent. See Moses, 913 F.3d at 306.

Given that this discussion was dicta, this Court must now decide de novo whether Section 5(n) applies to a deceptive act or practice claim. The plain terms of Section 5(n) only apply to "unfair" acts or practices. See 15 U.S.C. § 45(n) ("The Commission shall have no authority under this section . . . to declare unlawful an act or practice on the grounds that such act or practice is unfair . . ." (emphasis added)). See FTC v. Cyberspace.Com LLC, 453 F.3d 1196, 1199 n.2 (9th Cir. 2006). That clear statutory language controls. See, e.g., POM Wonderful LLC v. Coca-Cola Co., 573 U.S. 102, 112 (2014). Therefore, the Court finds that importing such a requirement into a deceptive practice claim would be an improper reading of the statute and declines Mr. Braun's invitation to do so.

Turning now to the merits, the factual record is replete with evidence that defendants undertook three deceptive acts or practices. First, defendants withdrew more money from their customers' bank accounts than defendants were entitled to under the MCA Agreements. Second, defendants falsely advertised that personal guaranties were not required, when defendants in fact

required personal guaranties from business owners. Third, defendants falsely represented that the MCA Agreements had no upfront fees, even though defendants, in practice, withheld fees from the upfront lumpsum that was advanced to their consumers. The Court addresses each deceptive act in turn.

First, the undisputed facts establish that defendants over-debited their customers' bank accounts. The MCA Agreements specified the total amount that customers would need to repay defendants in exchange for the upfront lumpsum that customers would receive. SMF, ¶ 70. To collect on the amount owed, the MCA Agreements authorized defendants to make daily debits from the customers' bank accounts until the amount owed was repaid. Id. ¶ 71. In actuality, however, defendants had a practice of withdrawing more than the total amount that was owed from customers' bank accounts until customers asked them to stop. Id. ¶¶ 72-76. Defendants thus misrepresented the amount of money that they would withdraw from their customers' bank accounts. Furthermore, this misrepresentation was material and would have reasonably misled defendants' customers because the representation regarding the amount that customers owed was expressly stated in the contracts. See SMF, ¶ 70; Med. Billers Network, 543 F. Supp. 2d at 304; Five-Star Auto Club, Inc., 97 F. Supp. 2d at 528.

Second, the undisputed facts establish that defendants falsely advertised on their website that personal guaranties were

not required, when, in fact, they were. Their website stated that "no personal guaranty of collateral" is required and that there are "[n]o [c]redit or [c]ollateral [r]equirements." SMF, ¶ 97; Pl. Ex. 35, Att. C at 28, 31, 36-37, ECF No. 109-42. In actuality, however, defendants required customers to sign a "Security Agreement and Guaranty" that obligated business owners to personally guarantee their businesses' performance of the MCA Agreement. SMF, ¶¶ 98-99. Sometimes, moreover, defendants included a contractual provision allowing defendants to pursue such owners in the event of default, id. ¶ 100, and defendants regularly required the business owners to sign COJs in which they confessed to judgment "individually and personally," id. ¶ 101. Finally, in practice, defendants enforced the personal guaranties. Id. ¶¶ 102-03. Thus, the statements on defendants' website were false, and since those false statements were express, they are presumed to be material and customers' reliance on those statement is reasonable. Med. Billers Network, 543 F. Supp. 2d at 304; Five-Star Auto Club, Inc., 97 F. Supp. 2d at 528.

Third, the undisputed facts establish that defendants misled customers into thinking there were no upfront fees and that they would receive a specified upfront lumpsum amount. Their website stated there were "No Upfront Costs." SMF, ¶ 104. And the MCA Agreements specified an upfront lumpsum amount that would be paid. Id. ¶¶ 105, 111-12. However, in practice, defendants deducted fees

from the upfront lumpsum amount, resulting in consumers receiving less than the total upfront lumpsum amount specified in the MCA Agreement. Id. ¶¶ 106-07. To add insult to injury, defendants would also regularly withhold from the upfront lumpsum amount even more than the fees. Id. ¶¶ 115, 130. Thus, defendants' representations that customers would not be charged upfront fees and would receive a specified upfront amount are false, and since the representations were express, they are material and it is reasonable for a consumer to rely upon them. Med. Billers Network, 543 F. Supp. 2d at 304; Five-Star Auto Club, Inc., 97 F. Supp. 2d at 528.

Mr. Braun, for his part, does not dispute that these deceptive acts or practices occurred. Rather, he argues that he did not have the requisite level of control or participation for the imposition of individual liability.

"An individual may be held liable under [Section 5 of] the FTCA for a corporation's deceptive acts or practices if, with knowledge of the deceptive nature of the scheme, he either participates directly in the practices or acts or has authority to control them." Moses, 913 F.3d at 306. There is direct participation "when [a defendant] engages in deceptive acts or practices that are injurious to customers with at least some knowledge of the deception." LeadClick Media, 838 F.3d at 169-70. A defendant's "[a]uthority to control . . . can be evidenced by active involvement in the business affairs and the making of

corporate policy, including assuming the duties of a corporate officer." Moses, 913 F.3d at 307.

To show knowledge, "actual and explicit knowledge of the particular deception at issue" is not necessary; instead, "knowledge may be established by showing that the individual defendant had actual knowledge of the deceptive conduct, or was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth." Id. "The degree of participation in business affairs is a relevant factor in determining whether [an individual defendant] had knowledge of [a corporate defendant's] wrongful actions." Id. at 309.

Mr. Braun exercised considerable control over all the defendants in this case. He "was an owner, manager, and officer of RCG," had decision-making authority for all defendants (including the authority to establish policies and employment practices), "created content" for defendants' website, had extensive involvement and control over the MCA Agreements, made decisions about collecting missed payments, exercised authority to declare customers in default, and exercised authority over the filing of COJs. SMF, ¶¶ 27-29, 31-32, 34-36, 41-44. The evidence shows that Mr. Braun personally participated in, and had knowledge of, the over-withdrawals. Id. ¶¶ 77, 79-96. Furthermore, Mr. Braun's knowledge of the securing of personal guaranties (despite

advertising to the contrary) is evidenced by his authority and involvement with creating content for their website and for the MCA Agreements, and his declaring customers in default, including an email from Mr. Braun to a consumer stating he would be going after the consumer personally. See SMF, ¶¶ 32, 34-36, 41-44, 97-103; Pl. Ex. 35 at 1187, ECF No. 109-51 ("We will be going after the company and you personally with our legal team."). Finally, the evidence show that Mr. Braun knew of, and participated in, the scheme to deduct upfront fees and not pay the specified upfront lumpsum. SMF, ¶¶ 34-36, 39, 104-124, 129.

In an effort to prop up his position, Mr. Braun cites to his own declaration (which he submitted twice).[6] Compare Braun Decl., ECF No. 120, with Braun Decl. in Opp'n., ECF No. 120-21. Then, citing to his own self-serving declaration, Mr. Braun argues that he did not control the corporate defendants and did not participate in or make any of the misrepresentations that are the basis for the Section 5 claim. See Braun Decl. in Opp'n., ¶¶ 4, 14. By itself, however, such bare and conclusory testimony does not create a genuine dispute of material fact. See, e.g., Adler v. Penn Credit Corp., No. 19-CV-7084, 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11,

---

[6] Although Mr. Braun does not reference it in his opposition brief, in his Rule 56.1 Statement Mr. Braun also cites to his own testimony at an investigative hearing held by the New York Attorney General. See Def. Ex. 3, ECF. No 122-1. To the extent Mr. Braun relies on his own conclusory testimony at this hearing, that too cannot create a genuine dispute of material fact.

2022) ("[A] non-moving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment."); Walker, 210 F. Supp. 3d at 503; Khudan v. Lee, No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

Therefore, the FTC has established that the undisputed facts show that Mr. Braun, with knowledge of the deceptive acts of defendants, both actively participated in, and had authority to control, those deceptive acts. It is therefore proper to impose individual liability on Mr. Braun for Count I. Accordingly, the FTC is entitled to summary judgment on Count I against Mr. Braun.

b. Count II-IV: Unfair Practices In Violation of Section 5 of the FTCA

Counts II through IV assert Mr. Braun violated Section 5 of the FTCA by engaging in three unfair business practices. Each count is addressed below.

Section 5(n) states that a practice is unfair when it "causes or is likely to cause substantial injury to consumers [that] is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). See FTC v. Verity Int'l, Ltd., 335 F. Supp. 2d 479, 498 (S.D.N.Y. 2004) (quoting 15 U.S.C. § 45(n)). Although the Second Circuit has not had the occasion to opine on the meaning of "substantial injury," "reasonably

avoidable," or when an injury is "not outweighed by countervailing benefits to consumers or to competition," the Court finds the case law from other circuits and district courts instructive.

"An act or practice can cause 'substantial injury' by doing a small harm to a large number of people, or if it raises a significant risk of concrete harm." FTC v. Neovi, Inc., 604 F.3d 1150, 1157 (9th Cir. 2010). And to "determin[e] whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." Id. at 1158. See also FTC v. Windward Mktg., Inc., No. Civ. A 1:96-CV-615F, 1997 WL 33642380, at *11 (N.D. Ga. Sept. 30, 1997) ("the Court focuses on whether the consumers had a free and informed choice that would have enabled them to avoid the unfair practice"). However, "[a]n injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1168-69 (9th Cir. 2012). Finally, an injury is not outweighed by other benefits when there are "clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition." FTC v. Johnson, 96 F. Supp. 3d 1110, 1151 (D. Nev. 2015). See also FTC v. Pointbreak Media, LLC, 376 F. Supp. 3d 1257, 1286 (S.D. Fl. 2019).

1. Count II: Misuse of COJs

The undisputed facts show that defendants violated Section 5 by misusing COJs. Defendants mandated that customers (the businesses and the businesses' owners) "sign a Confession of Judgment confessing judgment in the event of a default of the Merchant Agreement." SMF, ¶ 132. Although the MCA Agreements only permitted defendants to execute upon the COJs in limited circumstances, defendants filed and executed COJs in situations not permitted by the MCA Agreements. Id. ¶¶ 133-37. This plainly unfair practice caused substantial financial injury to customers, including business closures, loss of employees, and difficulty obtaining credit. Id. ¶ 153. Customers could not reasonably avoid this practice because the COJs were filed outside the bounds that were permissible pursuant to the MCA Agreements. Thus, customers could not have avoided or anticipated the filing of the COJs, as adhering to the contract would not stop defendants from filing the COJs. Finally, it is self-evident that there is no benefit to customers or the public when defendants improperly seek judgments against unwitting, innocent customers.

2. Count III: Threats to Consumers

The undisputed facts show that defendants violated Section 5 by making improper threats to customers. Defendants repeatedly threatened customers, with physical, reputational, and financial harm, in order to collect payments. SMF, ¶¶ 157-69. This unfair

practice caused substantial injury to customers, including financial, emotional, and reputational harms. Id. ¶¶ 172-73. There was no way for customers to reasonably avoid defendants' practice of making improper threats, as customers had no reason to know they would be threatened if they were unable to make payments under the MCA Agreements and defendants appear to have threatened customers at their own caprice and whim. Finally, there is absolutely no benefit to customers or competition when defendants use improper means, such as threats of bodily harm, to collect on amounts owed.

### 3. Count IV: Unauthorized Withdrawals

The undisputed facts show that defendants violated Section 5 by making unauthorized withdrawals from customers' accounts. Although the MCA Agreements only permitted defendants to "debit the specific daily amount each business day," defendants regularly "withdrew multiple payments on one business day," including making unauthorized double debits the day before or after a bank holiday, and defendants also, on occasion, withdrew more than the contractually permitted daily amount. SMF, ¶¶ 174-81. And, as discussed above, defendants also continued making debits after customers had paid the entire amount that was owed to defendants. See SMF, ¶¶ 72-73. That is an unfair practice. See, e.g., FTC v. Wells, 385 F. App'x 712, 713 (9th Cir. 2010) ("Carrying out unauthorized transactions was an unfair practice.").

It also caused substantial financial injury to customers because more debits were withdrawn than were contractually authorized. See SMF, ¶¶ 74-75, 180-89. Customers could not avoid these unauthorized withdrawals, as the MCA Agreements gave customers no reason to expect that these withdrawals would occur. And finally, there is no countervailing benefit to competition or the customers when defendants withdraw more money than they are entitled to contractually.

Once again, Mr. Braun does not genuinely dispute that any of these unfair trade practices occurred. Instead, he argues that he cannot be held individually liable for these unfair practices. Although the Second Circuit has not directly addressed the standard for holding an individual liable for a corporate defendant's unfair acts under Section 5 of the FTCA, nothing in LeadClick Media or Moses indicates that the standard for imposing individual liability would differ based on whether a deceptive act or unfair practice is alleged under Section 5 of the FTCA. Therefore, the Court will use the same standard here that it used to determine whether it was appropriate to impose individual liability on Mr. Braun for the corporate defendants' deceptive acts.

As explained above, the FTC has undisputedly established Mr. Braun's authority to control defendants. SMF, ¶¶ 27-29, 31-32, 34-36, 38-44. The FTC has also established Mr. Braun's personal participation in and knowledge of each of the three alleged unfair

acts or practices. First, as it relates to the misuse of COJs (the basis of Count II), Mr. Braun had direct involvement with the MCA Agreements (and thus can fairly be said to know the contractual terms) and yet personally directed the filing of COJs in circumstances that were not contractually proper. See SMF, ¶¶ 34-36, 132-41, 144, 146, 150. Second, Mr. Braun personally made numerous threats against customers and provided a script to another individual that included improper threats; it is also therefore fair to deduce from those facts that Mr. Braun had knowledge of this unfair practice. SMF, ¶¶ 157, 159-63, 165, 168-69, 171. Finally, Mr. Braun knew of defendants' practice of making unauthorized withdrawals, as evidenced by an email from Mr. Braun explicitly instructing another individual not to make a holiday debit, as well as by the fact that a customer complained directly to Mr. Braun about the double-debit issue. SMF, ¶¶ 179, 182; Pl. Ex. 35 at 1423-24, ECF No. 109-53; Pl. Ex. 12, ¶¶ 19-20, ECF No. 109-14. And, as discussed above, Mr. Braun personally participated in, and had knowledge of, the over-withdrawals. SMF, ¶¶ 77, 79-96.

Citing to his own self-serving and conclusory declaration (again), Mr. Braun argues he had no involvement with the COJs, did not own or control defendants, and never made any threats. Braun Decl. in Opp'n., ¶¶ 4, 14-38. But, as discussed above, such conclusory testimony cannot create a genuine dispute of material

fact. Therefore, the undisputed facts show that Mr. Braun, with knowledge of the unfair acts, both directly participated in those acts and had authority to control those acts.

Accordingly, the FTC is entitled to summary judgment on Counts II, III, and IV against Mr. Braun.

c. Count V: GLB Section 521

Section 521(a)(2) of the GLB Act makes it unlawful "for any person to obtain or attempt to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution." 15 U.S.C. § 6821(a)(2). The FTC argues that Mr. Braun violated this provision by making false representations about the MCA Agreements -- namely that defendants would collect a specified amount from customers and customers would receive a specified lumpsum upfront -- in order to obtain customers' bank account information to make withdrawals. Mr. Braun for his part does not dispute the underlying facts of the FTC's theory. Rather, Mr. Braun, relying heavily on legislative history, argues that this provision was not intended to reach this type of misconduct. It appears that no other court has addressed the scope of this statutory provision, so the Court will rely on the tools of statutory interpretation to determine whether this provision reaches the misconduct that the FTC alleges.

"Customer" and "customer information of a financial institution" are statutorily defined. "Customer" is defined as "any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as fiduciary." 15 U.S.C. § 6827(1). Defendants' customers were small businesses, and small businesses are "persons." See, e.g., 1 U.S.C. § 1 (the term "person . . . include[s] corporations, companies, associations, firms, partnerships, and joint stock companies, as well as individuals"). Neither side appears to contest that these small businesses had bank accounts open at financial institutions, and that, therefore, defendants' customers are covered by this statutory provision. Second, "customer information of a financial institution" is defined as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of the financial institution and is identified with the customer." 15 U.S.C. § 6827(2). Plainly, the information that defendants required from customers about their bank accounts -- their routing numbers, bank account numbers, and any information needed for accessing and controlling their bank accounts -- falls within the definition of "customer information of a financial institution." See SMF, ¶¶ 60-62.

The dispute between the parties appears to be about the scope of the phrase "false, fictitious, or fraudulent statement." The

FTC argues that the same misrepresentations that violated Section 5 of the FTCA, namely, "(1) they would collect a specific amount from customers' bank accounts . . . to repay their funding to customers and (2) that they would provide customers with a specific amount of funding," are the "false, fictitious, or fraudulent statements" that defendants used to obtain their customers' bank account information. See FTC Mem. at 25. Mr. Braun counters that the statutory phrase should not reach that far because a House Report gives "misrepresenting the identity of the person requesting the information or otherwise misleading an institution or customer into making unwitting disclosures of such information" as an example of conduct that would be "fraudulent or deceptive." Def. Mem. at 19; H.R. Conf. Rep. No. 106-434, at 173 (1999). Mr. Braun argues that never having the intent to perform contractual obligations is different in kind than the false statements that the GLB Act was intended to reach (i.e., "impersonation and similar fraud"). Def. Mem. at 19-20.

Mr. Braun's argument proves too much. The plain text of the statutory provision controls, and legislative history cannot alter the meaning of the plain text. See Oklahoma v. Castro-Huerta, 142 S. Ct. 2486, 2496 (2022) ("the text of a law controls over purported legislative intentions unmoored from any statutory text"). The plain text reaches "false, fictitious, or fraudulent statement[s]" full stop. The Court will not read a limitation

29

(i.e., that the means of deception must be akin to impersonation) into the text. Furthermore, even if there is some limit to that phrase, it certainly reaches statements that would be independently violative of Section 5 of the FTCA (as that provision only reaches misleading representations, omissions, or practices). As discussed above, the statements about the amounts owed and the lumpsum amount that customers would be given were independently violative of Section 5 of the FTCA as material, misleading misrepresentations. Therefore, given that the undisputed facts show that defendants used these false statements to induce customers to sign the MCA Agreements and disclose their bank account information, which in turn permitted defendants to over-withdraw from customers' bank accounts, the FTC has established a violation of Section 521 of the GLB Act.

The question then becomes whether Mr. Braun is individually liable for defendants' violations of Section 521 of the GLB Act. That raises a threshold issue that appears to be undecided in the Second Circuit: what standard applies? The FTC argues that the same individual liability standard that applies under Section 5 of the FTCA should apply to the GLB Act. See FTC Mem. at 26 n.10. Mr. Braun does not respond to this argument or propose that a different standard should apply. Although this is a novel issue in this Circuit, the Second Circuit's holding in Moses convinces this Court that the FTC is correct that the same standards for imposing

individual liability under Section 5 of the FTCA apply to imposing individual liability under Section 521 of the GLB Act.

In _Moses_, the Second Circuit held that the individual liability standard under Section 5 of the FTCA "applies when the FTC brings an action to enforce the FDCPA [Fair Debt Collection Practices Act]" because:

> "[V]iolations of the FDCPA are deemed to be unfair or deceptive acts or practices under the [FTCA]." _Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA_, 559 U.S. 573, 577, 130 S.Ct. 1605, 176 L.E.2d 519 (2010); _see also_ 15 U.S.C. § 1692*l*(a) ("[A] violation of [the FDCPA] shall be deemed an unfair or deceptive act or practice in violation of" the FTCA and is subject to enforcement "in the same manner as if the violation had been a violation of a[n] [FTC] trade regulation rule.") The FTC, then, is enforcing the FDCPA pursuant to its authority under the FTCA. And because the FTC can enforce compliance with the FDCPA only by employing the FTCA, and "in the same manner as a violation" of the FTCA, 15 U.S.C. § 1692*l*(a), it follows, we conclude, that the FTCA individual liability standard applies.

_Moses_, 913 F.3d at 307.

That logic demands that the same result obtain here. Section 522 of the GLB Act states that the FTC can enforce compliance with Section 521 of the GLB Act "in the same manner and with the same power and authority as the Commission has under the Fair Debt Collection Practice Act . . . to enforce compliance with such Act." 15 U.S.C. § 6822(a). It follows therefore that the same standard for imposing individual liability under the FDCPA should apply to claims under the GLB Act, and the Second Circuit has already held in _Moses_ that the individual liability standard that applies under

the FDCPA is the same individual liability standard that applies under Section 5 of the FTCA. Therefore, the Court applies the same individual liability standard that applies under Section 5 of the FTCA to determine if Mr. Braun is individually liable for defendants' violations of the GLB Act.

As discussed extensively above, Mr. Braun had the authority to control almost every aspect of what the defendants did, including negotiating and approving the terms of the MCA Agreements (which required the disclosure of customers' bank account information and included the false statements about the specified withdrawal amounts and specified upfront lumpsum amount). SMF, ¶¶ 27-29, 31-32, 34-36, 38-44, 54-56, 59-62. And, as discussed above, Mr. Braun also knew about and directly participated in over-withdrawing from customers' bank accounts and underfunding the MCA Agreements. Id. ¶¶ 34-36, 39, 77, 79-96, 104-124, 129. In his brief, Mr. Braun raises no disputes about the underlying facts that the FTC claims constituted a violation of the GLB Act. Accordingly, there is no genuine dispute of material fact that Mr. Braun is liable under Section 521 of the GLB Act. The FTC is therefore entitled to summary judgment on Count V against Mr. Braun.

C.   Remedies

Having found Mr. Braun liable on the claims asserted by the FTC, the Court now turns to the issue of remedy. The FTC seeks

three kinds of remedies: money damages, civil penalties, and a permanent injunction. For the reasons discussed below, the Court finds there are genuine issues of fact that preclude granting summary judgment to the FTC on damages and civil penalties, but the Court will issue a permanent injunction.

a. Compensatory Damages

The FTC seeks money damages for Mr. Braun's violations of the GLB Act. The parties dispute whether the FTC has the authority to do so. The Court agrees with the FTC that it has the statutory authority to seek monetary relief for violations of the GLB Act.[7]

Section 522(a) of the GLB Act allows the FTC to enforce Section 521 of the GLB Act (the provision that Mr. Braun violated) "in the same manner and with the same power and authority" that the FTC "has under the [FDCPA]." See 15 U.S.C. § 6822(a). The FDCPA, meanwhile, authorizes the FTC to use "[a]ll of [its] functions and powers . . . under the FTCA" to enforce compliance

_____

[7] The Supreme Court's decision in AMG Capital Management v. FTC does not hold otherwise. There, the Supreme Court held that Section 13 of the FTCA, which allows the FTC to obtain a "permanent injunction," does not authorize the FTC to obtain "equitable monetary relief such as restitution or disgorgement." AMG Cap. Mgmt., LLC v. FTC, 141 S. Ct. 1341, 1344 (2021). Unlike the provision at issue in AMG, here the FTC invokes a provision of the FTCA that explicitly does allow for money damages. Compare 15 U.S.C. § 53(b) (permitting a "permanent injunction"), with 15 U.S.C. 57b(b) (permitting "the payment of damages"). In fact, the Supreme Court in AMG recognized the difference in language between Section 13 and Section 19. See AMG Cap. Mgmt., 141 S. Ct. at 1348-49.

with it. 15 U.S.C. § 1692*l*(a). Specifically, the FDCPA authorizes the FTC to treat a violation of it "in the same manner as if the violation had been a violation of a Federal Trade Commission trade regulation rule." Id. And, under Section 19 of the FTCA, this Court is authorized "to grant such relief as [it] finds necessary to redress injury to consumers . . . resulting from the *rule* violation," including "the payment of damages." 15 U.S.C. § 57b(b) (emphasis added). Because GLB violations (like FDCPA violations) can be treated like rule violations, the FTC can seek money damages against Mr. Braun under Section 19.

Turning now to the calculation of compensatory damages, the parties disagree about the amount of compensatory damages that Mr. Braun properly owes. For the reasons discussed below, the Court finds there are genuine disputes of material fact that preclude summary judgment on compensatory damages.

The FTC initially submitted Dr. McAlvanah's report to argue that it was entitled to $4,847,911 in compensatory damages for defendants' overcharging consumers and over-deducting fees. FTC Mem. at 33-34; See Pl. Ex. 34, ECF No. 109-41. The FTC reached this calculation based on taking a random sample of accounts from a full data pool of 1,499 customers. SMF, ¶ 194. Based on a random sample of 87 accounts, Mr. McAlvanah concluded that 23 accounts were overcharged, which corresponds to a 26.4% incidence rate. Id. ¶ 194; Pl. Ex. 34, ¶ 19. Mr. McAlvanah also concluded that

the mean overpayment amount was $8,579. SMF, ¶ 195; Pl. Ex. 34, ¶ 24. Extrapolating all this to the full data pool of 1,499 customers, the FTC concluded that 395 customers were overcharged a mean of $8,579, which multiplied together would be $3,377,705. SMF, ¶¶ 194-95. Then, based on a random sample of 52 accounts, Mr. McAlvanah concluded that defendants over-deducted fees from 18 accounts, which corresponds to a 36.4% incidence rate. Id. ¶ 196; Pl. Ex. 34, ¶ 32. Mr. McAlvanah also concluded that the mean over-deduction was $2,817. SMF, ¶ 197; Pl. Ex. 34, ¶ 36. Extrapolating this to the full data pool of 1,499 deals, the FTC concluded that 518 customers experienced a mean over-deduction in fees of $2,817, which multiplied together would be $1,459,206. SMF, ¶¶ 196-97. Therefore, the FTC sought $4,874,911 in compensatory damages. FTC Mem. at 34.

However, in opposition, Mr. Braun correctly noted there is a three-year statute of limitations imposed on any monetary damages that the FTC may recover, see 15 U.S.C. § 57b(d), and that the FTC was seeking compensatory damages for violations outside that statutory window. Def Mem. at 24-26. The Court then permitted Mr. Braun to amend his answer to assert the statute of limitations defense. See 6/13/22 Memo Endorsement; Amended Answer, ECF No. 136.

In its reply brief, the FTC conceded that there is a three-year statute of limitations and that it had "inadvertently used

the Defendant's full history of misrepresentations to small business consumers without accounting for the 3-year limitations period." FTC Reply Mem. in Further Supp. of Mot. for Summ. J. ("FTC Reply Mem."), at 14, ECF No. 129. In an effort to correct this fundamental error in its expert's report, the FTC now offers a new declaration from Elizabeth Kwok (an FTC investigator) stating that of the full data set of 1,499 deals, "1,354 had at least one payment withdrawn by Defendants on or after June 10, 2017." Pl. Ex. 37, ¶ 12, ECF No. 129-1. Using that new number as the full data pool and relying on the same incidence rates and mean overcollection and over-deduction amounts, the FTC argues that its revised amount is $4,381,059. FTC Reply Mem. at 15. The FTC urges the Court to exercise its discretion to consider this newly submitted evidence on reply.

The Court, however, has concerns. The first concern is methodological. Instead of submitting a revised and updated expert report from Dr. McAlvanah accounting for the statute of limitations, the FTC submitted a declaration containing one sentence that concludes 1,354 deals should be considered as within the statutory period. See Pl. Ex. 37, ¶ 12. The declaration does not explain how this conclusion was reached, the data that was relied upon, or how this establishes that only violations that occurred within the statute of limitations will figure into the calculation of damages. Nor does it assure the Court that the

random sample -- which drew from a pool of deals inside and outside the statute of limitations period and which was used as the basis for calculating the incidence rate and mean overcollections and over-deductions of fees -- is still an appropriate sample. It is not clear if the random sample included deals outside the statutory window and it is not clear if its calculations included over-deductions and over-collections that occurred outside the statutory window. That gives the Court pause because the declaration does not explain if there are variations in the frequency or amount of over-collections and over-deductions between the deals within the statute of limitations period (i.e., on or after June 10, 2017) and those deals outside the statute of limitations period.

The second concern is equitable. By making this new revision in its reply papers and based on new facts, the FTC deprived Mr. Braun of the ability to contest whether 1,354 is the number of deals that fall within the statutory period. It also deprived Mr. Braun of the ability to contest the methodological soundness of the FTC's new calculation.[8] In essence, the FTC is asking the

---

[8] Mr. Braun did submit his own expert report that objects to the methodology of the FTC's expert report, see Def. Ex. 11, ECF No. 120-13, but it is inadmissible and cannot be considered on summary judgment because it is unsworn and there is no indication from the record that it the expert later reaffirmed his opinion in an affidavit or at a deposition. See Berk v. St. Vincent's Hosp. and Med. Ctr., 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn expert reports do

Court to grant summary judgment based on a fact that Mr. Braun never had the chance to dispute.

Although the Court agrees with the FTC that the Court has discretion to consider new evidence submitted with a reply brief, see Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venez., 341 F. App'x 722, 724 (2d Cir. 2009), in these circumstances the Court declines to exercise that discretion. The FTC's recalculation is not, as the FTC contends, simply a response to issues raised in Mr. Braun's opposition. See Toure v. Cent. Parking Sys. of N.Y., No. 05 Civ. 5237, 2007 WL 2872455, at *2 (S.D.N.Y. Sept. 28, 2007) (denying a motion to strike new evidence submitted with a reply when they did "not raise new arguments, but rather respond to issues raised in opposition or amplify points already made on the initial motion"). Rather, it is an entirely new argument about the scope of the appropriate damages. The initial calculation of damages was for five years and was based on 1,499 deals; now, the FTC's calculation of damages is for three

---

not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support."); Richardson v. Corr. Med. Care, Inc., 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) ("subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment"). However, this indicates that if he had been given the chance, Mr. Braun would have contested this revised 1,354 figure, further convincing the Court that granting summary judgment on a basis of a revised figure that Mr. Braun could not respond to would be inequitable.

years and is based on 1,354 deals. The FTC should not get a second chance to show it is entitled to summary judgment on compensatory damages when Mr. Braun had no chance to respond and the underlying data that was necessary for the appropriate damages calculations surely was available to the FTC at the time of its opening brief. See, e.g., D'Alessandro v. Arrow Pharmacy Holdings, LLC, 3:20-CV-536, 2023 WL 1967245, at *5 (D. Conn. Feb. 13, 2023) ("It is well established that a party cannot attempt to cure deficiencies in its moving papers by introducing new evidence in its reply when the effect would be to deprive the opposing party of the opportunity to respond."); Thompson v. Spota, CV 14-2473, 2018 WL 6163301, at *26 (E.D.N.Y. Aug. 23, 2018) ("It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden."); Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C., 513 F. Supp. 2d 18, 20 (S.D.N.Y. 2007) ("To allow plaintiff to then submit new materials to meet its burden would inappropriately allow plaintiff a second bite at the summary judgment apple."); Mack v. Hall, No. 9:18-CV-0875, 2020 WL 5793438, at *6 (N.D.N.Y. July 27, 2020) ("Because the affidavit is new evidence, and [the opposing party] was not provided with an opportunity to respond to the evidence in a sur-reply, the Court will not consider the affidavit.").

Given that the evidence in the record would not allow the Court to definitively resolve the amount of damages that the FTC is entitled to within the statute of limitations period, the Court denies summary judgment on compensatory damages.

b. Penalties

The FTC also seeks monetary penalties. Section 5(m)(1)(A) authorizes the FTC to recover "a civil penalty in a district court of the United States against any person" who violates any trade regulation rule "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that [his] act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). "A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." United States v. Nat'l Fin. Servs., Inc., 98 F.3d 131, 139 (4th Cir. 1996). See also United States v. Dish Network, L.L.C., 954 F.3d 970, 978 (7th Cir. 2020) ("But § 45(m)(1)(A) includes a variation on an ignorance-of-law defense; a business can be liable only if it either knew that the act was unlawful or if it should have known that the act was unlawful.").

Here, the FTC claims that Mr. Braun is subject to this civil penalty for his violations of the GLB Act. As explained above, the GLB Act is deemed to be a provision of the FTCA for purposes of

its enforcement and can be treated as a rule violation, and there is no genuine dispute that Mr. Braun violated the GLB Act.

The sole remaining issue is whether Mr. Braun <u>knowingly</u> violated the GLB Act. The FTC identifies two pieces of undisputed evidence that, it contends, show that Mr. Braun knew that his actions violated the GLB Act. First, in defendants' contract with Actum Processing (the merchant processor that they used to execute withdrawals from consumers' bank accounts), they expressly agreed to comply with all laws, including the GLB Act. SMF, ¶¶ 190-92. <u>See</u> Pl. Ex. 35, Att. G at 214-15, 218, ECF No. 109-42. Second, Mr. Braun directed one of his co-defendants, Mr. Giardina, to sign an amendment to a contract that expressly warranted that defendants were not subject to investigation or legal proceedings related to the GLB Act. SMF, ¶ 193; Pl. Ex. 35, Att. II at 1448-54, ECF No. 109-53.

"[V]iew[ing] th[is] evidence in the light most favorable to" Mr. Braun and "draw[ing] all reasonable inferences in favor of" Mr. Braun, as the Court must on summary judgment, <u>Mountain Tobacco Co.</u>, 942 F.3d at 541, the Court concludes these facts are insufficient to conclusively establish actual or constructive knowledge on summary judgment. This evidence falls short of actual knowledge, as it does not definitively establish that Mr. Braun knew of the GLB Act and its statutory commands. The issue of constructive knowledge is a much closer issue, but the Court finds

that a reasonable factfinder could draw competing inferences from this evidence, one favorable to the FTC and one favorable to Mr. Braun. On the one hand, a reasonable factfinder could infer constructive knowledge based on these two facts. On the other hand, a reasonable factfinder could also infer Mr. Braun did not have constructive knowledge that the GLB Act forbid misrepresenting contractual terms to obtain consumers' bank account information simply based on two contracts that represented the corporation was in compliance with all laws and regulations (including the GLB Act among many other laws) and that the corporation was not subject to investigation or legal proceedings under the GLB Act or other laws. The Court believes this is a quintessential question of fact for a factfinder. The Court therefore denies summary judgment to the FTC on its entitlement to civil penalties.

c. Permanent Injunction

Finally, the FTC seeks a permanent injunction whose terms would (1) prohibit Mr. Braun from marketing, selling, or collecting on (or assisting others with marketing, selling, or collecting on) merchant case advances; (2) prohibit him from participating in debt collection activities; (3) prohibit him from making misrepresentations concerning products or services; (4) prohibit him from making unauthorized debits, withdrawals, or charges; (5) require him to dismiss any pending cases against customers, terminate any UCC liens against customers, and request

removal of negative credit reports issued against customers; (6) prohibit him from violating the GLB Act; (7) impose monitoring conditions that would require Mr. Braun to provide customer information, acknowledge receipt of this Court's Order, submit compliance reports, and maintain certain records; and (8) permit the FTC to monitor Mr. Braun's compliance with this Court's Order. See FTC Revised Proposed Order, at 14-17, 20-26, ECF No. 129-2. Mr. Braun only objects to the provisions that would ban him from making merchant cash advances and from participating in debt collection activities and that would require him to dismiss pending cases and terminate UCC liens. For the reasons discussed below, the Court will issue a permanent injunction but will slightly modify the terms the FTC proposes.

Section 13(b) of the FTCA authorizes this Court to grant a permanent injunction against violations "of any provision of law enforced by the [FTC]." 15 U.S.C. § 53(b). See FTC v. Bronson Partners, LLC, 654 F.3d 359, 365 (2d Cir. 2011) (acknowledging Section 13(b) permits the issuance of a permanent injunction). The Court can issue a permanent injunction when "there exists some cognizable danger of recurrent violation," United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953), "or some reasonable likelihood of future violations," FTC v. Minuteman Press, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998). See also Med. Billers Network, 543 F. Supp. 2d at 323. Courts look to a list of factors to

"determin[e] whether such danger exists" that "include[s]: defendant's scienter, whether the conduct was isolated or recurrent, whether defendant is positioned to commit future violations, the degree of consumer harm caused by defendant, defendant's recognition of his culpability, and the sincerity of defendant's assurances (if any) against future violations." FTC v. Instant Response Sys., LLC, No. 13 Civ. 00976, 2015 WL 1650914, at *10 (E.D.N.Y. Apr. 14, 2015). See also Med. Billers Network, 543 F. Supp. 2d at 323.

Here, in light of the egregiousness of Mr. Braun's conduct, the seriousness of the harm he inflicted on consumers, his continuing denial of his role in the misconduct, and the sheer number of times Mr. Braun engaged in misconduct, the Court has no trouble finding a permanent injunction prohibiting Mr. Braun from making merchant cash advances or participating in debt collection activities (as defined the FTC's proposed order) to be appropriate. See, e.g., FTC v. Shkreli, 581 F. Supp. 3d 579, 639 (S.D.N.Y. 2022) (issuing a lifetime industry ban when the defendant engaged in "egregious, deliberate, repetitive, long-running, and ultimately dangerous illegal conduct"). See also FTC v. Fed. Check Processing, Inc., 14-CV-122S, 2016 WL 5940485, at *4, *7 (W.D.N.Y. Oct. 13, 2016) (issuing an injunction "permanently ban[ning] Defendants from engaging in debt collection activities or assisting others who do"); Instant Response Sys.,

LLC, 2015 WL 1650914, at *10 (issuing an injunction banning defendant from "engaging in the marketing, promotion or sale of medical alert goods or services"); Verity Int'l, 335 F. Supp. 2d 500 (issuing a permanent injunction "prohibiting defendants . . . from participating in any capacity in the offering of audiotext or videotext services to U.S. consumers"). The Court also finds the provisions requiring Mr. Braun to refrain from illegal conduct and to request removal of negative credit reports issued against customers to be appropriate. The monitoring provisions are also appropriate to ensure compliance with the permanent injunction.

However, Mr. Braun correctly notes that requiring him to dismiss any pending cases against consumers and terminate any liens imposed against consumers under the UCC would result in a windfall for his counterparties. To the extent that Mr. Braun's consumers have been harmed by his conduct, they will be compensated by the damages that the FTC will likely prove are warranted to a factfinder. An additional remedy for past harm, of the sort that the FTC envisions, is not required.

Accordingly, the Court will issue a permanent injunction that includes all the terms the FTC proposes except for the terms that require Mr. Braun to dismiss any pending case or terminate UCC liens.

III. <u>Conclusion</u>

For the foregoing reasons, the Court hereby enters summary judgment to the FTC on liability on all claims asserted against Mr. Braun. Additionally, the Court enters a permanent injunction, the terms of which are identical to the FTC's proposal except for excluding the provisions requiring the dismissal of pending lawsuits and the termination of UCC liens. However, the Court denies the FTC summary judgment on compensatory damages and civil penalties.

SO ORDERED.

Dated:    New York, NY

September 27, 2023        JED S. RAKOFF, U.S.D.J.