# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

STATE OF FLORIDA, and

STATE OF NEW YORK,

      Plaintiffs,

    v.

THE TAX CLUB, INC., also doing business as
SUCCESS MERCHANT SERVICES,
CORPORATE TAX NETWORK, CORPORATE
CREDIT, and E-TAX HOTLINE 8882790191, a
Utah corporation,

MANHATTAN PROFESSIONAL GROUP, INC.,
also doing business as THE TAX CLUB,
BOOKEEPING SERVICES, BOOKKEEPING
SERVICES, IKONGO, ESSENTIAL PLANNING,
CORPORATE TAX NETWORK, BUSINESS
DOCUMENT CENTER, THE SUCCESS
PLANNING GROUP, ALL ACCESS BOOKS, and
VITAL PAYROLL, a New York corporation,

5410, INC., also doing business as INTERNET
MARKETING SUCCESS, THE SUCCESS
PLANNING GROUP, SUCCESS PLANNING
GROUP 2, SUCCESS ONLINE, BUSINESS
CREDIT, SUCCESS MERCHANT PROCESSING,
REAL ESTATE WIRE, DAY TRADE TEAM,
FUNDING FASTTRACK, CORPORATE CREDIT,
CORPORATE CREDIT 2, and PRESTIGE
FINANCING SERVICES, a Wyoming corporation,

MARBLE BASE, INC., also doing business as
BUSINESS RESOURCES, CORPORATE
SOLUTIONS, BUSINESS SUCCESS, BUSINESS
SERVICES, ONLINE DEVELOPMENT, and JADE
SEEK, a Wyoming corporation,

6015, LLC, also doing business as CYPRESS

Case No. 13-cv-210 (JMF)

**FIRST AMENDED COMPLAINT
FOR PERMANENT
INJUNCTION AND OTHER
EQUITABLE RELIEF**

CORP. SERVICES, MY TAX SERVICE, and
ACCOUNTING GROUP SERVICES, a Wyoming
limited liability company,

1800ACCOUNTANT, LLC, a Delaware limited
liability company,

IKONGO, INC., a Wyoming corporation,

TAHUYA, INC., a Washington corporation,

VISAVIS, INC., a Washington corporation,

HB MARKETING SERVICES, LLC, also doing
business as GLOBAL EDUCATION, WEBSITE
SERVICES, CELL PHONE COACHING,
MAVERICK MM, and EMAIL CASH, an Arizona
limited liability company,

PREMIER COACHING & CONSULTING, LLC,
also doing business as PREMIER COACHING,
WEBSITE SERVICES, AC SECRETS:
8774372521, AUTOMATIC PROFIT SYSTEM,
ADVANCED PROFITS, VIP PROFITS,
AUTOMATIC PROFIT SYSTEM VIP, and
AUTOMATIC PROFIT SYSTEM ADVANCED,
an Arizona limited liability company,

SKORPIOS HOLDINGS, INC., also known as
SKORPIOS HOLDING, INC., a Delaware
corporation,

EDWARD B. JOHNSON, also known as TED
JOHNSON, also known as TEDD JOHNSON,
individually and as a director, officer or owner of
THE TAX CLUB, INC., MANHATTAN
PROFESSIONAL GROUP, INC., 5410, INC., and
IKONGO, INC.,

MICHAEL M. SAVAGE, individually and as a
director, officer or owner of THE TAX CLUB,
INC., MANHATTAN PROFESSIONAL GROUP,
INC., 5410, INC., MARBLE BASE, INC., 6015,

INC., IKONGO, INC., 1800ACCOUNTANT, LLC,
TAHUYA, INC., VISAVIS, INC., and SKORPIOS
HOLDINGS, INC.,

BRENDON A. PACK, individually and as an
officer or owner of MANHATTAN
PROFESSIONAL GROUP, INC., MARBLE
BASE, INC., TAHUYA, INC., and SKORPIOS
HOLDINGS, INC.,

GARY J. MILKWICK, individually and as an
officer or owner of THE TAX CLUB, INC.,
MANHATTAN PROFESSIONAL GROUP, INC.,
5410, INC., 6015, LLC, 1800ACCOUNTANT,
LLC, HB MARKETING SERVICES, LLC,
PREMIER COACHING & CONSULTING, LLC,
and SKORPIOS HOLDINGS, INC.,

     Defendants, and

SANDRA C. SAVAGE,

     Relief Defendant.

Plaintiffs, the Federal Trade Commission ("FTC"), the State of Florida, and the State of

New York (collectively, "Plaintiffs"), for their Complaint allege:

     1.    The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and

Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to

obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of

contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, appointment

of a receiver, and other equitable relief for Defendants' acts or practices in violation of Sections

5(a) of the FTC Act, 15 U.S.C. § 45(a) and the FTC's Trade Regulation Rule entitled

Telemarketing Sales Rule ("TSR" or "Rule"), 16 C.F.R. Part 310.

2.     The State of Florida brings this action under the Florida Deceptive and Unfair

Trade Practices Act ("FDUTPA"), §§ 501.201 et seq., Fla. Stat., to obtain temporary,

preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution,

the refund of monies paid, disgorgement of ill-gotten monies, appointment of a receiver, and

other equitable relief for Defendants' acts or practices in violation of FDUTPA. The State of

Florida has conducted an investigation, and the head of the enforcing authority, Attorney General

Pamela Jo Bondi, has determined that an enforcement action serves the public interest.

3.     The State of New York brings this action under New York Executive Law §

63(12) ("NY Exec. Law"), which authorizes the Attorney General of the State of New York to

bring an action for injunctive relief, restitution, damages and costs against any person or business

which has engaged in repeated or persistent fraud or illegality in the conduct of its business, and

New York General Business Law ("GBL") §§ 349 and 350, which authorize the Attorney

General to bring an action for injunctive relief, restitution and penalties whenever any person,

firm, corporation or association or agent or employee thereof has engaged in deceptive business

practices and false advertising. The Attorney General has determined that notice of this proposed

action under GBL §§ 349(c) and 350-d is not in the public interest.

**<u>JURISDICTION AND VENUE</u>**

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c) and 6105(b).

5.     This Court has supplemental jurisdiction over plaintiffs State of Florida's and

State of New York's claims under 28 U.S.C. § 1367.

6. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## **PLAINTIFFS**

7. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

8. The FTC is authorized to initiate federal district court proceedings, in its own name and by its designated attorneys, to enjoin violations of the FTC Act and the Telemarketing Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, refund of monies paid, and disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), and 57b.

9. The State of Florida is the enforcing authority under FDUTPA pursuant to Florida Statutes Section 501.203(2) and is authorized to pursue this action to enjoin violations of FDUTPA and to obtain legal, equitable or other appropriate relief including rescission or reformation of contracts, restitution, the appointment of a receiver, disgorgement of ill-gotten monies, or other relief as may be appropriate. § 501.207, Fla. Stat.

10. The State of New York, by its Attorney General, is authorized to take action to enjoin repeated and persistent fraudulent and illegal business conduct under NY Exec. Law § 63(12) and deceptive business practices and false advertising under GBL §§ 349 and 350 and to obtain legal, equitable or other appropriate relief including rescission or reformation of contracts,

restitution, the appointment of a receiver, disgorgement of ill-gotten monies, or other relief as may be appropriate.

## DEFENDANTS

### The Corporate Defendants

11.     Defendant The Tax Club, Inc. ("TTC") is a Utah corporation with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118, and a secondary address at 1492 Silicon Way, Bldg. A, St. George, Utah 84770.  TTC also does business as Success Merchant Services, Corporate Tax Network, Corporate Credit, and E-Tax Hotline 8882790191.  TTC transacts or has transacted business in this district and throughout the United States.

12.     Defendant Manhattan Professional Group, Inc. ("MPG") is a New York corporation with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118.  MPG also does business as The Tax Club, Bookeeping Services, Bookkeeping Services, Ikongo, Essential Planning, Corporate Tax Network, Business Document Center, The Success Planning Group, All Access Books, and Vital Payroll.  MPG transacts or has transacted business in this district and throughout the United States.

13.     Defendant 5410, Inc. is a Wyoming corporation with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118, and a secondary address at 1492 Silicon Way, Bldg. A, St. George, UT 84770.  5410, Inc. also does business as Internet Marketing Success, The Success Planning Group, Success Planning Group 2, Success Online, Business Credit, Success Merchant Processing, Real Estate Wire, Day Trade Team, Funding FastTrack, Corporate Credit, Corporate Credit 2, and Prestige Financing Services.  5410, Inc. owns 55% of Defendant HB Marketing Services, LLC and 55% of Defendant Premier Coaching

6

& Consulting, LLC. 5410, Inc. transacts or has transacted business in this district and throughout the United States.

14.     Defendant Marble Base, Inc. ("Marble Base") is a Wyoming corporation with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118, and a secondary address at an apartment building in Bellevue, Washington. Marble Base also does business as Business Resources, Corporate Solutions, Business Services, Business Success, Online Development, and Jade Seek. Marble Base transacts or has transacted business in this district and throughout the United States.

15.     Defendant 6015, LLC is a Wyoming limited liability company with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118. 6015, LLC also does business as Cypress Corp. Services, My Tax Service, and Accounting Group Services. 6015, LLC transacts or has transacted business in this district and throughout the United States.

16.     Defendant 1800Accountant, LLC ("1800Accountant") is a Delaware limited liability company with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118. 1800Accountant transacts or has transacted business in this district and throughout the United States.

17.     Defendant Ikongo, Inc. ("Ikongo") is a former Wyoming corporation with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118, and a secondary address at 1492 W. Silicon Way, Suite C, St. George, Utah 84770. Though administratively dissolved by the Wyoming Secretary of State on March 16, 2009 for failure to maintain a registered agent, Ikongo has continued to operate as a *de facto* corporation by maintaining bank accounts in furtherance of the conduct alleged herein. Ikongo transacts or has transacted business in this district and throughout the United States.

7

18.     Defendant Tahuya, Inc. ("Tahuya") is a former Washington corporation with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118, and secondary addresses at an apartment building in Bellevue, Washington and at a home residence of defendant Brendon Pack in New York.  Though dissolved on August 23, 2010, Tahuya has continued to operate as a *de facto* corporation by maintaining bank accounts in furtherance of the conduct alleged herein.  Tahuya transacts or has transacted business in this district and throughout the United States.

19.     Defendant VisaVis, Inc. ("VisaVis") is a Washington corporation with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118, and a secondary address at the home residence of defendant Michael Savage in Connecticut.  VisaVis transacts or has transacted business in this district and throughout the United States.

20.     Defendant HB Marketing Services, LLC ("HB Marketing Services") is an Arizona limited liability company with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118.  HB Marketing Services also does business as Global Education, Website Services, Cell Phone Coaching, Maverick MM, and Email Cash.  HB Marketing Services transacts or has transacted business in this district and throughout the United States.

21.     Defendant Premier Coaching & Consulting, LLC ("Premier Coaching") is an Arizona limited liability company with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118.  Premier Coaching also does business as Premier Coaching, Website Services, AC Secrets: 8774372521, Automatic Profit System, Advanced profits, VIP Profits, Automatic Profit System VIP, and Automatic Profit System Advanced.  Premier Coaching transacts or has transacted business in this district and throughout the United States.

22.     Defendant Skorpios Holdings, Inc., also known as Skorpios Holding, Inc.,

8

("Skorpios," and together with TTC, MPG, 5410, Inc., Marble Base, 6015, LLC, 1800Accountant, Ikongo, Tahuya, VisaVis, HB Marketing Services, and Premier Coaching, the "Corporate Defendants" or "The Tax Club Enterprise") is a Delaware corporation with its principal place of business at 350 Fifth Avenue, Suite 6015, New York, New York 10118. Following a reorganization of ownership in approximately November 2011, Skorpios has served as the holding company for TTC, MPG, 6015, LLC, 1800Accountant, and 5410, Inc., which itself is the majority owner of HB Marketing Services and Premier Coaching. Skorpios transacts or has transacted business in this district and throughout the United States.

### The Individual Defendants

23.     Defendant Edward B. Johnson, also known as Ted Johnson, also known as Tedd Johnson, ("Johnson") is a resident of St. George, Utah and Rancho Santa Fe, California. He was the Chief Executive Officer ("CEO") of TTC and MPG until approximately August 2011 and the sole owner of TTC and MPG until approximately November 2011, and the Secretary and 50% owner of 5410, Inc. until approximately November 2011. He was also a director, officer, and 90% owner of Ikongo. In approximately November 2011, Johnson sold his interest in TTC, MPG, and 5410, Inc. but continued to maintain an ongoing referral relationship with the business through at least the commencement of this action. By and through TTC, MPG, 5410, Inc., and Ikongo, Johnson has harmed U.S. consumers with his deceptive business practices. At all times material to this Complaint, acting alone or in concert with others, Johnson has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Examples of Johnson's conduct that are typical and illustrative of his direct participation are described in greater detail in Paragraphs 37, 38, 43, 44, 50, 51, 53, 63, 64, 66, 69, 74, 76, 77, 93, 95, 133, 135, and 136 below. Johnson, in connection with the matters alleged

9

herein, transacts or has transacted business in this district and throughout the United States.

24.     Defendant Michael M. Savage ("Savage") is a resident of New Canaan, Connecticut.  In 2008, he became the President of TTC and MPG.  He is the President and CEO of 5410, Inc., and until approximately November 2011, he was a 50% owner.  Savage is also Secretary and 50% owner of Marble Base, President of 6015, Inc., President of 1800Accountant, a director, President, and 5% owner of Ikongo, President and 50% owner of Tahuya, and President and owner of VisaVis.  In approximately November 2011, Savage became CEO of and acquired a 51% ownership interest in Skorpios (the holding company for TTC, MPG, 6015, LLC, 1800Accountant, and 5410, Inc., which itself is the majority owner of HB Marketing and Premier Coaching).  By and through the Corporate Defendants, Savage has harmed U.S. consumers with his deceptive business practices.  At all times material to this Complaint, acting alone or in concert with others, Savage has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Examples of Savage's conduct that are typical and illustrative of his direct participation are described in greater detail in Paragraphs 38, 40-44, 47, 48, 50-53, 63-65, 69, 71-73, 76, 77, and 133-137 below.  Savage, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

25.     Defendant Brendon A. Pack ("Pack"), is a resident of Bellevue, Washington and New York, New York and has been the Director of Sales for MPG since 2010, serving as a Sales Manager before then.  He is also the President and a 50% owner of Marble Base and Vice-President and a 50% owner of Tahuya.  In approximately November 2011, Pack became Vice-President of Sales for and acquired a 35% ownership interest in Skorpios (the holding company for TTC, MPG, 6015, LLC, 1800Accountant, and 5410, Inc., which itself is the majority owner

of HB Marketing and Premier Coaching). By and through the Corporate Defendants, he has

harmed U.S. consumers with his deceptive business practices. At all times material to this

Complaint, acting alone or in concert with others, Pack has formulated, directed, controlled, had

the authority to control, or participated in the acts and practices set forth in this Complaint.

Examples of Pack's conduct that are typical and illustrative of his direct participation are

described in greater detail in Paragraphs 39, 42, 46, 48, 50-53, 63-65, 69, 71, 77, 85, 94, 95, 133

136, and 137 below. Pack resides in this district and, in connection with the matters alleged

herein, transacts or has transacted business in this district and throughout the United States.

26.     Defendant Gary J. Milkwick ("Milkwick") is a resident of Ridgewood, New

Jersey. He became Director of Tax Operations for MPG in July 2007 and then Vice-President of

Operations at MPG in May 2009. He is also the Treasurer of 5410, Inc., Vice-President of 6015,

LLC, Vice-President of 1800Accountant, and an officer of HB Marketing Services and Premier

Coaching. In approximately November 2011, Milkwick became President of TTC and also

became President of and acquired a 9% ownership interest in Skorpios (the holding company for

TTC, MPG, 6015, LLC, 1800Accountant, and 5410, Inc., which itself is the majority owner of

HB Marketing Services and Premier Coaching). By and through the Corporate Defendants, he

has harmed U.S. consumers with his deceptive business practices. At all times material to this

Complaint, acting alone or in concert with others, Milkwick has formulated, directed, controlled,

had the authority to control, or participated in the acts and practices set forth in this Complaint.

Examples of Milkwick's conduct that are typical and illustrative of his direct participation are

described in greater detail in Paragraphs 40, 48-50, 52, 53, 63-65, 69, 71-73, 76, 77, 133, 136,

and 137 below. Milkwick, in connection with the matters alleged herein, transacts or has

transacted business in this district and throughout the United States.

11

## The Relief Defendant

27.     Relief defendant Sandra C. Savage is a resident of New Canaan, Connecticut. She is the spouse of defendant Michael Savage. Sandra Savage has received funds that can be traced directly to the Defendants' unlawful acts or practices alleged in this Complaint, and she has no legitimate claim to those funds. For example, even though Sandra Savage is a stay-at-home mom, from April 2010 through June 2012, she received monthly electronic funds transfers from VisaVis totaling well in excess of $6 million. Her husband, defendant Michael Savage, is the President of VisaVis. Those transfers represent funds from consumer purchases deposited, directly and indirectly, with VisaVis and are ill-gotten proceeds of the Defendants' deceptive business practices described in this Complaint.

## COMMON ENTERPRISE

28.     TTC, MPG, 5410, Inc., Marble Base, 6015, LLC, 1800Accountant, Ikongo, Tahuya, VisaVis, HB Marketing Services, Premier Coaching, and Skorpios are all closely held companies that have operated and functioned as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged in this Complaint. They have conducted the business practices described below as an interrelated network of companies that have common ownership, control, officers, directors, members, managers, office locations, customer databases, and mailing addresses. Also, as described below, the Corporate Defendants co-mingle funds and rely on a shared method to identify potential customers through lead referrals, sell their products and services through a common telemarketing staff, bill customers through a common billing department, and handle customer service through a common customer service staff. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices described in this Complaint.

12

Furthermore, Johnson, Savage, Pack, and Milkwick (the "Individual Defendants," and, together with the Corporate Defendants, the "Defendants") have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

29. At all times material to this Complaint, the Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Florida Statutes Section 501.203(8).

## DEFENDANTS' BUSINESS PRACTICES

### Introduction

30. Since at least 2008, and continuing through at least the commencement of this action, the Defendants have used a variety of deceptive tactics outlined below to induce consumers to purchase products and services purportedly designed to assist them in building and developing a small business. The Defendants sell, among other things, tax preparation and advice, business planning and counseling, and business credit development services.

31. The Defendants begin their marketing and sales efforts by purchasing so-called consumer leads. A "lead" is the contact information for a potential customer. The Defendants purchase their leads from entities that, like The Tax Club Enterprise, also market services to consumers interested in building a work-at-home, internet, or other small business.

32. Using these leads, the Defendants engage in, or cause others to engage in, telemarketing through a plan, program, or campaign involving one or more telephones and more than one interstate call. The Defendants have taken in over $220 million from consumers across the country since 2008 alone.

13

33.     The Defendants typically begin their sales calls by falsely claiming that they are affiliated with companies that recently sold consumers a business development product or service.  The Defendants typically tell consumers that they are calling on behalf of or at the direction of those other companies to discuss ways to improve the consumers' would-be businesses.  In fact, the Defendants are not affiliated with those other companies and are not calling on their behalf or at their direction.  Rather, the Defendants merely purchased the consumers' names and contact information from those companies as leads.  The Defendants then generate their own sales by promising that experienced professionals will provide an array of benefits and services including individualized business planning, tax counseling, and business credit development, and by claiming that their programs are essential to the success of the consumer's would-be business and will soon pay for themselves.

34.     After consumers make their initial purchase, Defendants continue to target them with repeated follow-up telemarketing calls designed to induce additional sales.  During these uspell calls, Defendants continue to employ high-pressure sales tactics and continue to make false or misleading representations about the products and services they offer, again promising, among other things, expert advice, individualized business planning, tax counseling, and business credit development.

35.     Within days, weeks, or months of purchasing a product or service from the Defendants, consumers discover that what they bought is neither helpful nor necessary.  The products and services provided by the Defendants give little or no substantive guidance or assistance.  For example, the business planning documents the Defendants provide typically are boilerplate and non-specific to the individual consumer, the credit development plans are

14

similarly general and therefore ineffective, and the expert counseling services are typically inaccessible.

36.     In numerous instances, consumers who purchase the Defendants' products and services are not successful in establishing a business and do not earn any money.  While some consumers are able to start and operate a business in spite of the Defendants' empty promises, even these consumers typically have earned no profit.

### The Individual Defendants Built The Enterprise

37.     The Tax Club Enterprise began in 2003 when Johnson formed TTC and MPG. He was CEO and sole owner of both entities.  Also in 2003, Johnson relocated the core enterprise to New York City from St. George, Utah, where only a small sales and administrative office remained.  The enterprise's operations, including its telemarketing staff, remain principally located in the Empire State Building in New York City.

38.     In 2003, Johnson recruited Savage, his friend from college, as head accountant.  In 2008, Savage became President of TTC and MPG and has since been The Tax Club Enterprise's senior-most official in New York, overseeing fulfillment, reporting, finance, customer service, client relations, and marketing operations.  He reported to Johnson until approximately November 2011.

39.     Pack joined The Tax Club Enterprise in 2004.  Since at least 2010, he has supervised sales operations and managed the sales staff for The Tax Club Enterprise as Director of Sales at MPG.  He helped set policies governing sales practices and directly addressed escalated complaints from dissatisfied customers.  He managed a subset of the sales staff for a time before 2010.

40.     Savage hired Milkwick, his friend from college, in 2007 as Director of Tax

15

Operations for MPG. Since at least 2009, when Milkwick became MPG's Vice-President of Operations, he has overseen fulfillment of The Tax Club Enterprise's products and services. Milkwick designed The Tax Club Enterprise's fulfillment operational structure, which is based on geographic regions.

41.     In February 2008, Savage formed VisaVis and became its President.

42.     In March 2008, Savage and Pack formed Tahuya. Savage became its President and Pack its Vice-President, and each owned half the company.

43.     In April 2008, Johnson and Savage formed Ikongo. Johnson owned 90% of the company, and Savage owned 5% and served as its President.

44.     In September 2008, Johnson and Savage formed 5410, Inc. Savage served as President and CEO, Johnson served as Secretary, and each owned half the company.

45.     In April 2010, 5410, Inc. acquired a controlling ownership interest (55%) in HB Marketing Services and in Premier Coaching which, until that point, had been separate companies providing similar small business development services as The Tax Club Enterprise.

46.     In May 2010, Pack formed Marble Base. Pack served as President, Savage served as Secretary, and each owned half the company.

47.     In August 2011, Savage formed Skorpios.

48.     In approximately November 2011, Johnson sold TTC and MPG and his 50% interest in 5410, Inc. to Skorpios. Skorpios, in turn, serves as a holding company for the new owners of The Tax Club Enterprise, namely, Savage, Pack, Milkwick, and a non-party minority owner named Lindsay Kush.

49.     In February 2012, Milkwick formed 6015, LLC and 1800Accountant, both of which became additional holdings of Skorpios. Milkwick served as an officer of each.

16

50.    Following the November 2011 sale, Savage became CEO and a 51% owner of Skorpios, Pack became Vice-President of Sales and a 35% owner, Milkwick became President and a 9% owner, and non-party Lindsay Kush continued in her role as Controller for the enterprise and became a 5% owner.  Skorpios, in turn, owned and held TTC, MPG, 1800Accountant, 6015, LLC, and 5410, Inc., which, in turn, owned a controlling interest in HB Marketing Services and Premier Coaching.  Johnson no longer held any formal ownership or managerial position within The Tax Club Enterprise, but he did remain connected to the business through a referral relationship in which he would receive a percentage of all revenues derived from certain lead sources.  Even after November 2011, Johnson continued receiving millions of dollars from The Tax Club Enterprise.

51.    The following diagram depicts the ownership structure of the entities comprising The Tax Club Enterprise before the November 2011 reorganization:



52.     The following diagram depicts the ownership structure of the entities comprising The Tax Club Enterprise after the November 2011 reorganization:



53.     From at least 2008 through the November 2011 reorganization, Johnson, Savage, Pack, and Milkwick were the principal managers in control of The Tax Club Enterprise.  Since the November 2011 reorganization and continuing through at least the commencement of this action, Savage, Pack, and Milkwick have been the principal managers in control, with Johnson continuing in his participation through a referral arrangement.

## The Corporate Defendants Are One Business

54.     TTC and MPG have been the main operating companies within The Tax Club Enterprise since its inception.  With limited exception, they employ the sales, fulfillment, customer service, billing, and administrative staff and own the product brands sold by The Tax

18

Club Enterprise.

55.     5410, Inc. allows the Defendants to sell to customers who have depleted their savings and accessed all their available credit by providing them financing for additional purchases from The Tax Club Enterprise, typically through its DBA (doing business as) name, Prestige Financing Services.

56.     The remaining Corporate Defendants, as well as TTC, MPG, and 5410, Inc., further the enterprise by, among other things, maintaining commercial bank accounts to receive and redistribute funds from consumer purchases and by maintaining merchant accounts, often under various DBA names, that enable The Tax Club Enterprise to process credit and debit card payments from consumers and, in turn, to exist as a telemarketing business.

## Banking and Credit Card Processing

57.     In order to accept credit card payments from consumers, a merchant must establish a merchant account with a merchant acquiring bank.

58.     Merchant acquiring banks are members of the credit card associations, such as MasterCard and Visa, and frequently enter into contracts with payment processors that manage the bank's merchant processing program.

59.     A merchant account is used to transmit credit card transaction data and allocate or settle funds between merchants and consumers.

60.     A merchant may establish a merchant account directly with a merchant acquiring bank.  In most cases, however, a merchant will establish a merchant account with a merchant acquiring bank through a payment processor.

61.     Payment processors are entities that process credit or debit card transactions between merchants and consumers.

62.     When a merchant obtains a merchant account through a payment processor, it typically enters into a merchant processing agreement with a merchant acquiring bank and the payment processor.

63.     The Individual Defendants used several different payment processors (or similar entities known as Independent Sales Organizations), including Global Payments, Inc., Applied Merchant Systems, Inc., and Newtek Merchant Solutions, to open and maintain numerous merchant accounts from multiple merchant acquiring banks, including HSBC Bank, Wells Fargo Bank, and BancorpSouth Bank.

64.     Each Individual Defendant signed merchant account applications for, and has maintained control over, merchant accounts in the name of one or more Corporate Defendants on behalf of The Tax Club Enterprise.

65.     More specifically, since 2008 alone, the Individual Defendants maintained over 50 merchant accounts in the name of TTC, MPG, 5410, Inc., Marble Base, 6015, LLC, 1800Accountant, HB Marketing Services, and Premier Coaching to process payments from consumers.  The following table identifies some of those accounts and the Individual Defendants listed on the applications:

| Entity On Application | DBA Name On Application | Person On Application | Application Date | Processor |
|---|---|---|---|---|
| 5410, Inc. | Internet Marketing Success | Savage | 8/29/08 | Global Payments, Inc. |
| 5410, Inc. | Success Merchant Processing | Savage | 10/14/08 | Global Payments, Inc. |
| 5410, Inc. | Real Estate Wire | Savage | 11/20/08 | Global Payments, Inc. |
| 5410, Inc. | Day Trade Team | Savage | 2/16/09 | Global Payments, Inc. |
| 5410, Inc. | Funding Fasttrack | Savage | 2/16/09 | Global Payments, Inc. |
| 5410, Inc. | Corporate Credit | Savage | 3/5/09 | Global Payments, Inc. |
| TTC | TTC | Savage | 7/27/11 | NewTek Merchant Services |
| TTC | Corporate Credit | Savage | 7/27/11 | NewTek Merchant Services |
| MPG | TTC | Savage | 7/27/11 | NewTek Merchant Services |
| MPG | Bookeeping Services | Savage | 7/27/11 | NewTek Merchant Services |
| MPG | Ikongo | Savage | 7/27/11 | NewTek Merchant Services |
| MPG | Essential Planning | Savage | 7/27/11 | NewTek Merchant Services |

| MPG | Corporate Tax Network | Savage | 7/27/11 | NewTek Merchant Services |
|---|---|---|---|---|
| 5410, Inc. | Internet Marketing Success | Savage | 7/27/11 | NewTek Merchant Services |
| 5410, Inc. | The Success Planning Group | Savage | 7/27/11 | NewTek Merchant Services |
| 5410, Inc. | Success Planning Group 2 | Savage | 7/27/11 | NewTek Merchant Services |
| 5410, Inc. | Success Online | Savage | 7/27/11 | NewTek Merchant Services |
| 5410, Inc. | Business Credit | Savage | 7/27/11 | NewTek Merchant Services |
| 5410, Inc. | Prestige Financing Services | Savage | 11/4/11 | NewTek Merchant Services |
| Marble Base | Business Resources | Pack | 10/4/11 | NewTek Merchant Services |
| Marble Base | Corporate Solutions | Pack | 10/4/11 | NewTek Merchant Services |
| Marble Base | Business Success | Pack | 10/19/11 | NewTek Merchant Services |
| 6015, LLC | Cypress Corp Services | Milkwick Pack | 2/23/12 | NewTek Merchant Services |
| 6015, LLC | My Tax Service | Milkwick Pack | 3/15/12 | NewTek Merchant Services |
| 6015, LLC | Accounting Group Services | Milkwick Pack | 3/15/12 | NewTek Merchant Services |
| 1800Accountant | 1800Accountant | Milkwick Pack | 2/29/12 | NewTek Merchant Services |
| MPG | MPG | Savage | 7/3/07 | Applied Merchant Systems, Inc. |
| MPG | TTC | Savage | 12/3/09 | Applied Merchant Systems, Inc. |
| MPG | All Access Books Vital Payroll Business Document Ctr Essential Planning | Savage | 10/1/07 | Applied Merchant Systems, Inc. |
| 5410, Inc. | Internet Marketing Success | Savage | 8/29/08 | Applied Merchant Systems, Inc. |
| 5410, Inc. | Internet Marketing Success | Savage | 8/29/08 | Applied Merchant Systems, Inc. |
| 5410, Inc. | Success Merchant Processing | Savage | 10/14/08 | Applied Merchant Systems, Inc. |
| 6015, LLC | Cypress Corp Services | Milkwick | 6/29/12 | Applied Merchant Systems, Inc. |
| 6015, LLC | Accounting Group Services | Milkwick | 7/26/12 | Applied Merchant Systems, Inc. |
| HB Marketing Services | HB Marketing Services | Savage | | Applied Merchant Systems, Inc. |
| HB Marketing Services | HB Marketing Services | Savage | 9/11/09 | Applied Merchant Systems, Inc. |
| Premier Coaching | Premier Coaching | Savage | 9/11/09 | Applied Merchant Systems, Inc. |
| Premier Coaching | Premier Coaching | Savage | | Applied Merchant Systems, Inc. |

66.     Another merchant account in the name of TTC (also listing TTC as the DBA name) was opened in February 2007 at Wells Fargo Merchant Services by Johnson.  This account processed consumer purchases from at least February 2008 through at least March 2012.

67.     Using so many different merchant accounts has enabled The Tax Club Enterprise to circumvent merchant monitoring programs and to continue to process consumers' credit and debit card purchases even though various merchant accounts were terminated for incurring high

levels of returns and disputed charges, or "chargebacks," as a result of the deceptive practices outlined in this Complaint.

68.    The DBA name is the name appearing on consumers' credit card statements.  The extensive number of DBA names and Corporate Defendant names used by the Defendants in their sales and billing practices demonstrates the enterprise's constant outward rebranding of its products and services from at least 2008 through at least 2012.  Constant rebranding has allowed The Tax Club Enterprise to continue to generate sales despite its false claims and misrepresentations by impeding consumers' ability to understand who was behind each sale, to research the seller before making a purchase, to access services, and to complain to industry groups and law enforcement about their dissatisfaction.

69.    The Individual Defendants have also opened and maintained multiple commercial bank accounts in the names of each of the Corporate Defendants to receive, redistribute, and withdraw funds from the credit and debit card sales transactions generated by The Tax Club Enterprise.  Each Individual Defendant signed applications for, and has maintained control over, commercial bank accounts in the name of one or more Corporate Defendants on behalf of The Tax Club Enterprise.

70.    TTC, MPG, 5410, Inc., 6015, LLC, Marble Base, 1800Accountant, Ikongo, Tahuya, VisaVis, HB Marketing Services, Premier Coaching, and Skorpios all have maintained corporate banking accounts used to receive or redistribute funds from customer purchases.

71.    Proceeds from sales transactions processed through one of the many merchant accounts maintained by the Corporate Defendants are deposited into many of these commercial bank accounts. Those deposits, net of returns and chargebacks, total in excess of $220 million since 2008 alone.  The following table identifies some of those accounts at Bank of America that

received the bulk of the consumer purchase money:

| Entity Name On Account | Signatories On Account | Bank Account Number (last 4 digits) | Net Consumer Deposits (As Of April 2012) | Opened As Early As | Open At Least Through |
|---|---|---|---|---|---|
| MPG | Savage | BoA 2780 | $42,102,189 | 1/2008 | 12/2012 |
| | Savage | BoA 7440 | $31,624,066 | 9/2007 | 12/2012 |
| | Savage | BoA 7453 | $21,489,185 | 9/2007 | 12/2012 |
| | Savage | BoA 7424 | $5,181,044 | 9/2007 | 12/2012 |
| | Savage | BoA 7437 | $5,088,296 | 9/2007 | 9/2010 |
| | | MPG Total: | $105,484,780 | | |
| TTC | Savage | BoA 7466 | $33,028,749 | 9/2007 | 12/2012 |
| 5410, Inc. | Savage | BoA 2930 | $29,232,255 | 2/2012 | 12/2012 |
| Marble Base | Savage Pack | BoA 7299 | $16,131,378 | 1/2011 | 5/2012 |
| | Savage Pack | BoA 0203 | $7,880,944 | 9/2012 | 5/2012 |
| | Savage Pack | BoA 9890 | $859,416 | 9/2012 | 5/2012 |
| | | Marble Base Total: | $24,012,322 | | |
| Ikongo | Savage | BoA 6277 | $10,392,937 | 3/2008 | 2/2012 |
| Tahuya | Savage Pack | BoA 6963 | $6,560,332 | 3/2008 | 7/2012 |
| VisaVis | Savage | BoA 9210 | $3,532,158 | 5/2008 | 12/2012 |
| | Savage | BoA 7904 | $822,086 | 9/2008 | 12/2012 |
| | Savage | BoA 6921 | $627,838 | 3/2008 | 12/2012 |
| | | VisaVis Total: | $4,982,082 | | |
| Premier Coaching | Milkwick | BoA 7215 | $4,444,288 | 3/2010 | 12/2012 |
| HB Marketing Services | Milkwick | BoA 7202 | $2,689,190 | 3/2010 | 12/2012 |

72.     Another account in the name of 6015, LLC (BoA 0384) was opened in February 2012 and received consumer purchase money deposits through a merchant account through at least December 2012.  Savage and Milkwick were signatories on this account.

73.     Another account at Bank of America in the name of 1800Accountant, LLC (BoA 0290) was opened in February 2012 and received consumer purchase money deposits through a merchant account through at least December 2012.  Savage and Milkwick were signatories on this account.

23

74.     Johnson was the signatory on an account at Wells Fargo Bank in the name of TTC (WF 8345) that was already open as of January 2008 and that received consumer purchase money deposits through a merchant account through at least April 2012.

75.     Routinely, money processed through a merchant account in the name of one Corporate Defendant is deposited by the merchant bank into a designated commercial bank account in the name of a different Corporate Defendant within the enterprise, further demonstrating the interrelationships among the Defendants.  The following chart shows some of the commercial bank accounts exhibiting this overlap:

| Entity Name On Account | Bank Account Number (last 4 digits) | "Indns" (Showing Merchant Account Entity/DBA Name) |
|---|---|---|
| Marble Base | BoA 0203 | Hb Marketing Services Co<br>Marble Base Inc Co<br>Online Development Co<br>Premier Coaching & Con Co<br>Success Online Co<br>Success Merchant Proce Co |
| MPG | BoA 2780 | The Tax Club Co.<br>Corporate Tax Network Co.<br>Ikongo Co. |
| 5410, Inc. | BoA 2930 | 5410 Inc Co<br>Corporate Credit 2 Co<br>Internet Marketing Sue Co<br>Success Merchant Proce Co<br>The Success Planning G Co |
| Tahuya | BoA 6963 | 5410 Inc Co<br>Tahuya  Inc Co<br>Website Services Co |
| HB Marketing Services | BoA 7202 | Automatic Profit Syste Co<br>Cell Phone Coaching Co<br>Email Cash Co<br>Global Education Co<br>Hb Marketing Services Co<br>Premier Coaching Con Co |
| Premier Coaching | BoA 7215 | Ac Secrets 8774372521 Co<br>Premier Coaching Con Co |

| Marble Base | BoA 7299 | 5410 Inc Co<br>Business Resources Co<br>Complete Websites Co<br>Corporate Solutions Co<br>Marble Base Inc Co<br>Online Development Co<br>Success Merchant Proce Co<br>Success Online Co<br>Tahuya Inc Co |
| TTC | BoA 7466 | 5410, Inc.<br>Corporate Credit |
| VisaVis | BoA 9210 | 5410 Inc. Co<br>Internet Marketing Suc Co<br>The Success Planning G Co |

76.     The deposited consumer funds are repeatedly transferred among the various bank accounts maintained by the Tax Club Enterprise.  The following is a typical and illustrative example.  Savage opened four accounts at Bank of America in 2008 (6921, 7904, 9210, 6947) in the name of corporate defendant VisaVis.  From April 2008 through June 2012, over $12 million was transferred into these VisaVis bank accounts from company accounts belonging to TTC, MPG, Marble Base, 5410, Inc., and Ikongo.  These funds were then transferred out of the VisaVis accounts and into bank accounts belonging to corporate defendant Skorpios, to individual defendants Johnson, Savage, and Milkwick, and to relief defendant Sandra Savage, among others.  Intercompany transfers of this sort involving bank accounts in the name of each Corporate Defendant occur routinely.

77.     Since 2008 alone, the Individual Defendants have extracted millions of dollars from The Tax Club Enterprise using these company accounts, including at least $18 million to Johnson, at least $8 million to Pack, at least $16 million to Savage, and at least $6 million to Sandra Savage.

25

## Products and Services

78.     The Defendants purport to offer various small business development products and services including tax return preparation, tax advice and online tax resources, payroll and accounting services, business entity formation, business planning and counseling, credit coaching and development, and logo and website design.  The Defendants bundle these same basic products and services into well over 100 different programs marketed under various brand names, including, among others: The Tax Club, All Access Books, My Essential Plans, Success Planning Group, Small Business Credit, Cypress Corporation Services, 1800Accountant, and Corporate Tax Network.

79.     TTC and MPG own these brands.

80.     For example, through the "The Tax Club" brand, the Defendants purport to offer a variety of programs including, but not limited to the following: Corporation Document Package, Business Starter Package, Business Saver Package, Business Saver Plus Package, Incorporation Package A, Incorporation Package B, Incorporation Package C, Incorporation Package H, Incorporation Package I, Incorporation Package J, E-Tax Hotline, Corporation & Kit, Corporate Records Pro, Unlimited Tax Consulting, Tax Plan, Resident Agent Service, Startup Guide, Money Management Guide, Business Financial Analysis, Z Package, Z Package Plus, Sole Proprietorship Package A, Sole Proprietorship Package B, TTC Finance Package A, TTC Finance Package B, and TTC Finance Package C.

81.     Through the "My Essential Plans" and "Small Business Credit" brands, the Defendants purport to offer a variety of programs including, but not limited to the following: (MEP) Bronze, (MEP) Silver, (MEP) Gold, (MEP) Platinum, MEP Foreign Business Plan, MEP +

SBC Silver, MEP + SBC Gold, Small Biz Credit Silver, Small Biz Credit Gold, Small Biz Credit

Platinum, New-SBC One-On-One Coaching, and New-SBC One-On-One Coaching + Business

Plan.

82.     Through the "Success Planning Group" brand, the Defendants purport to offer a

variety of programs including, but not limited to the following: Wealth Advisor Silver, Wealth

Advisor Gold, Wealth Advisor Platinum, VOX Silver, VOX Gold, VOX Platinum, VOX

Executive, Production 4 Profit Silver, Production 4 Profit Gold, Production 4 Profit Platinum,

Property Wire Premium, Property Wire Executive, Focus on the Business Basic, Focus on the

Business Plus, Focus on the Business Premium, Focus on the Business Executive, Biz Suite

Basic, Biz Suite Silver, Biz Suite Pro, Biz Suite Platinum, Biz Tweet Bronze, Biz Tweet Silver,

Biz Tweet Gold, and Biz Tweet Platinum.

83.     Through the "All Access Books" brand, the Defendants purport to offer a variety

of programs including, but not limited to, the following: Full Service Basic A, Full Service

Bronze A, Full Service Silver A, Full Service Gold A, Full Service Basic B, Full Service Bronze

B, Full Service Silver B, Full Service Gold B, CORP + All Access Bronze, All-Access Bronze,

All-Access Silver, All Access Gold, Full Service Basic, Full Service Bronze, Full Service Silver,

and Full Service Gold.

84.     The Defendants purport to offer a variety of additional programs including, but

not limited to, the following: Bronze eBiz, Silver eBiz, Gold eBiz, Platinum eBiz, Executive

eBiz, Making Real Money on the Internet and Super Cash System, Bronze Logo Package, Silver

Logo Package, Gold Logo Package, New Ikongo Platinum Logo, Link Power Bronze, Link

Power Gold, List Builder Gold, Drop Ship University Basic, Drop Ship University

Executive/Pro, Merchant V-Card Bronze, Merchant V-Card Silver, Merchant V-Card Gold, CTN

27

Incorporation Package A, CTN Incorporation Package B, CTN Incorporation Package C, CTN E-Tax Hotline, CTN Tax Plan, CTN Unlimited Tax Consulting, CTN Full Service Basic, CTN Full Service Bronze, CTN Full Service Silver, CTN Full Service Gold, CTN Business Plan Bronze, CTN Business Plan Silver, CTN Business Plan Gold, CTN Business Plan Platinum, CTN Corporate Credit Silver, and CTN Corporate Credit Platinum.

85.     Despite the *pro forma* allocation of programs with brands, sales representatives in practice were authorized to sell various products under various brands, as Pack confirmed to sales staff in June 2012.

86.     The Defendants typically charge consumers an up front fee of several thousand dollars for each of their various products and services followed by smaller monthly payments.

87.     The Defendants have sold their various products and services to tens of thousands of consumers since 2008 alone.  For example, TTC and MPG, the principal operating entities within The Tax Club Enterprise, acquired over 11,000 new customers annually both in 2010 and in 2009 and over 13,000 new customers in 2008.  The Defendants' sales are ongoing.

88.     The Defendants substantially prioritize sales over service in their staffing.  For example, despite their promises of specialized expertise, unlimited consulting, and individualized service, as of May 2010, TTC and MPG employed approximately 225 people, but fewer than 25% of them were charged with product and service fulfillment.  Sales representatives and administrative staff comprised over 75% of TTC and MPG's staff.  Moreover, as of August 2011, only six employees were Certified Public Accountants ("CPAs"), and only 11 were Enrolled Agents.  An Enrolled Agent ("EA") is a tax practitioner authorized to represent taxpayers before the Internal Revenue Service.

89.     Even as of early January 2013, the picture was largely unchanged, as the

28

Defendants still employed just five CPAs, 16 EAs, and five business plan writers.

## Consumer Leads and Sales Calls

90.     The Defendants rely on "leads" (the contact information of potential customers)
supplied by other businesses for a fee in order to market their products and services.  Those other
businesses are known as "lead sources."  Many of the Defendants' lead sources are also in the
business of selling purported business development programs and related services, and they
already have an existing or prior business relationship with the consumers supplied to the
Defendants as leads.

91.     The Tax Club Enterprise has paid at least $44 million for consumer leads from
2008 through 2012.  The primary lead sources during this period include: Professional Marketing
International ("PMI"), which received over $15 million through a related entity called National
Marketing Resources, LLC; Yolo Marketing Group, LLC and its affiliate, Yolo Media, which
together received over $7.7 million; Stores Online, Inc., which received over $7.6 million; and
NSA Technologies, LLC, which received over $1.3 million.  These lead sources offer consumers
work at home programs or startup services, such as business coaching or website building, and
have each been the subject of numerous consumer complaints and/or law enforcement actions.

92.     The Defendants' sales representatives contact the consumers identified as leads by
telephone for the purpose of selling the Defendants' products and services.  The Defendants, in
turn, typically remit 30-35% of the money they generate from each lead back to the lead source as
payment for the lead.  They also pay another 10-20% to their own sales representative who
generated the sale as commission.

93.     During his tenure as CEO and sole owner, Johnson helped formulate policies
governing sales practices.  For example, among other things, he created sample sales scripts to

guide sales representatives in making deceptive claims during telemarketing calls.  At least one such sales script was prepared with Pack in February 2010.

94.     Pack also prepared or helped prepare at least four sales scripts in 2009 and 2010 to guide sales representatives in making deceptive claims during telemarketing calls (including the one with Johnson).

95.     Sales scripts like those drafted by Johnson and Pack signal to sales representatives the kinds of topics to discuss and the kinds of claims that are likely to induce a sale. For example, among other things, they guide sales representatives: to falsely claim they are calling consumers "on behalf of" a particular lead source; to promise services like "unlimited, year round consulting," "comprehensive business plans," and "personal business advisors" that are never provided; and to misrepresent the cost of the products and services being offered for sale by false claims about how consumers' future businesses can "take over" those costs.

96.     The Defendants incentivize their sales representatives to aggressively market their products and services through a compounding commission methodology in which the percentage of a sales representative's commission increases with his or her total number of sales each week. Therefore, more sales transactions mean the sales representative receives a higher percentage of each individual sale as commission.

97.     These compounding commissions and sales scripts induce and guide sales representatives to make deceptive claims during sales calls.

98.     During sales calls, the Defendants' sales representatives do not promptly disclose that the purpose of the call is to sell a product or service, and they make a number of misrepresentations as outlined below, often using high-pressure sales tactics, to generate sales.

30

**False Affiliation Claims**

99.     The Defendants typically begin their sales calls by claiming that they are calling consumers on behalf of or at the direction of a particular lead source to discuss ways to improve the consumers' would-be businesses.  Consumers receiving these calls recently purchased a business development product or service from that lead source and are therefore misled to believe that the Defendants are connected to that product or service.

100.     After identifying themselves in this way, Defendants further claim that, in order for consumers to recoup the money they invested in the product or service they purchased from the lead source, consumers need to purchase additional products and services from the Defendants.  In this way, the Defendants pressure consumers into purchasing their own products and services out of fear that the money they already paid to the lead source will otherwise be lost.

101.     These affiliation claims are false because the Defendants are not calling consumers on behalf or at the direction of the lead source, which merely sold the Defendants the particular lead.  Also, in numerous instances, the Defendants' products and services do not enable consumers to recoup the money they invested in the product or service they purchased from the lead source.

**Misrepresentations About Recouping Purchase Price and Earnings**

102.     The Defendants typically charge consumers several thousand dollars for each of their various products and services.  The cost usually involves a large initial fee followed by smaller monthly payments.  The exact price typically depends on the amount of savings and credit consumers have available.  The Defendants' sales representatives probe consumers' financial circumstances during sales calls in order to maximize purchases and price.

103.     The Defendants tell consumers to use the credit available on their credit cards in

31

order to pay for, or invest in, their products and services. In instances where consumers do not have sufficient available credit or savings, the Defendants' sales representatives convince consumers to finance the charges.

104. In numerous instances, representatives encourage consumers to purchase the Defendants' programs by claiming that consumers ultimately will not have to pay the charges out of their own pocket.

105. In numerous instances, representatives claim that consumers who purchase the Defendants' products and services: (a) will earn enough money from their future businesses to recoup the purchase price; (b) will be able to recoup the purchase price through deductions on their tax returns; or (c) can transfer those costs to their future businesses.

106. The Defendants' claims about transferring and recouping the purchase price are false because, in numerous instances, consumers who purchase the Defendants' products and services are not able to recoup the purchase price from future business income, are not able to recoup the purchase price through tax deductions, and are not able to transfer the purchase price to future businesses. In fact, in numerous instances, consumers who purchase the Defendants' products and services are never able to establish an operating business.

107. In numerous instances, representatives also claim that consumers who purchase the Defendants' products and services will earn thousands of dollars per month from their future businesses.

108. These earnings claims are false because, in numerous instances, consumers who purchase the Defendants' products and services do not make thousands of dollars per month from future businesses.

### Misrepresentations About the Scope and Nature of Services Provided

109.     In numerous instances, Defendants mislead consumers about the scope of the programs they offer for sale.  The Defendants' products and services typically are bundled together and sold as programs.  Different programs include different products and services.  Sales representatives discuss various products and services that the Defendants offer without specifying which are, and which are not, included in any particular program.  Therefore, in numerous instances, consumers who purchase a particular program are misled to believe that they will receive more products and services than are actually included in the program they buy.

110.     In addition, the Defendants do not fulfill the products and services they sell as promised.  For example, in numerous instances, representatives falsely claim that: (a) consumers will have unlimited access to tax advisors, business advisors, or both who will provide specialized expert advice tailored to the consumers' specific needs; (b) consumers will receive individualized business plans tailored to their particular business; or (c) consumers will receive specialized assistance necessary to develop and obtain business credit.

111.     In numerous instances, purchasers are unable to access a live tax or business advisor, or even reach a single, consistent point of contact.  Instead, when purchasers call The Tax Club Enterprise seeking assistance, in numerous instances, they end up caught in a seemingly endless web of transfers from one representative to the next.

112.     In numerous instances, purchasers do not receive individualized business plans tailored to their particular businesses but, rather, only boilerplate, prefabricated plans.

113.     In numerous instances, purchasers receive only generic business credit information and are unable to obtain business credit.

## **The Related Upsells**

114.    Following an initial sale, the Defendants continue to market additional products and services to their customers by telephone.

115.    Typically, these upsell calls are masked as fulfillment calls that were scheduled for the ostensible purpose of providing services that the customer already purchased.  In fact, Defendants attempt to sell consumers additional products and services during these supposed fulfillment calls.  Defendants do not disclose promptly that the purpose of the call is in fact to sell additional products and services.

116.    During upsell calls, the Defendants leverage consumers' initial financial commitment to induce additional sales.  In numerous instances, representatives claim that consumers must supplement the products and services they already purchased from the Defendants with additional products and services in order to recoup the money they already paid.  Consumers are thus pressured into making additional purchases out of fear that the money they already paid will otherwise be lost.

117.    These supplementation claims are false because, in numerous instances, consumers who purchase additional products and services from the Defendants do not establish profitable businesses and are not able to recoup the money they had already paid.

118.    It is during these upsell calls that consumers often first realize that products and services they believed they had already purchased in actuality were not included in the programs they previously bought from the Defendants.

119.    In numerous instances, the Defendants' sales representatives also make the same kinds of additional misrepresentations during upsell calls as they do during initial sales calls.

Those additional misrepresentations include the following false claims: (a) consumers will have unlimited access to tax advisors, business advisors, or both who will provide specialized expert advice tailored to the consumers' specific needs; (b) consumers will receive individualized business plans tailored to their particular business; or (c) consumers will receive specialized assistance necessary to develop and obtain business credit.

### Refunds and Complaints

120.    Dissatisfied purchasers who request a refund often are unsuccessful because Defendants adhere to a refund policy that requires consumers to cancel within a three-day window for a full refund or within fifteen days for a partial refund. This refund policy is unworkable because consumers typically do not have the opportunity to use or access the Defendants' programs before the three or even fifteen-day windows expire. Consumers who try to cancel and obtain refunds are typically subject to a cumbersome process where they are subject to high-pressure pitches to continue the product or service and then transferred to another department for a so-called "secondary review." As a result, many consumers who request a refund from the Defendants are not given their money back.

121.    Dissatisfied customers have filed over 750 complaints against TTC with the Better Business Bureau of Utah ("BBB") continuously in just the three years preceding the commencement of this action. These complaints, reporting the kinds of deceptive practices described herein, were forwarded to The Tax Club Enterprise by the BBB.

122.    Dissatisfied consumers have the ability to dispute charges that appear on their credit card bills with their credit card issuers by initiating what is known as a "chargeback." The chargeback process is intended to protect consumers from fraud and unauthorized charges on their credit card bills. A consumer's right to initiate a credit card chargeback is guaranteed by

Regulation Z of the Truth in Lending Act, 15 U.S.C. §§ 1601-1616.

123.    When a consumer successfully disputes a charge through the chargeback process, the consumer's issuing bank credits the consumer's credit card for the amount of the disputed charge. The issuing bank, in turn, recovers the amount of the chargeback from the merchant acquiring bank, which typically collects that amount from the payment processor. The payment processor then typically collects the amount of the chargeback from the merchant.

124.    Credit card associations – such as Visa and MasterCard – have rules regarding the chargeback process. Those rules provide that customer disputes are relayed to the merchant, which, in turn, may challenge an attempted chargeback by arguing that the charge was, in fact, valid. If the merchant challenges the attempted chargeback, the credit card association rules govern the manner in which the dispute is resolved. If the merchant is successful in disputing the chargeback, the issuing bank reverses any provisional credit issued to the consumer and the consumer becomes financially responsible for the disputed charge. When a consumer's chargeback is successful, the disputed charge is removed from the consumer's account or an offsetting credit is issued.

125.    In contrast to a chargeback, a refund (or "return") occurs when a consumer contacts the merchant directly to obtain a reversal of charges to his or her credit card account. Refunds issued by merchants directly to consumers do not result in chargebacks. In some instances, a merchant may refund money to consumers while a chargeback is pending, which may help the merchant avoid the fees associated with the chargeback process.

126.    Thousands of the Defendants' customers have disputed their purchases.

127.    For example, from 2008 through 2010, the Defendants had a return and chargeback rate of over 20% of all sales processed through Bank of America Merchant Services,

36

one of their principal merchant acquiring banks for Visa and MasterCard purchases at that time.

128.    The Defendants also accepted Discover Card payments, and from January 2008 through May 2011, they incurred a return and chargeback rate of 13% of all sales through the Discover network, spiking to 19% in the first half of 2009.

129.    More broadly, from 2008 through 2012, the Defendants' bank records reveal a return and chargeback rate of approximately 15% of total sales during this period, a conservative estimate given that disputes typically lag behind the date of purchase and thus would be underreported during the latter part of this timeframe.

130.    Even apart from returns, the Defendants' chargeback rate alone was excessive. For example, from January 1, 2012 through January 16, 2013, The Tax Club Enterprise had a chargeback rate of over 10% of sales.  The credit card processing industry considers chargeback rates that exceed 1% to be high.

131.    Various reports generated by The Tax Club Enterprise discuss return and chargeback concerns, including, among others, Operations Manager's Reports from June through September 2012.

132.    Because the Defendants mislead consumers to induce sales, and because dissatisfied customers who were denied refunds have had to dispute their purchases with their credit card issuers in atypically high volumes, several of The Tax Club Enterprise's merchant accounts were terminated by their merchant acquiring banks due to excessive chargebacks and returns.  For example, Discover Financial Services, Inc. terminated seven merchant accounts for excessive chargebacks and returns in June 2009 and twelve more in February 2012, and Bank of America Merchant Services terminated one account for excessive chargebacks and returns in February 2010 and another in April 2010.

37

133. Each of the Individual Defendants was aware of and had regular discussions among themselves and with their staff concerning the excessive levels of consumer complaints.

134. For example, at least as early as May 2006, Savage began personally responding to bank inquiries about high chargeback levels.

135. In approximately late 2008/early 2009, Johnson and Savage met at the Empire State Building offices and reviewed consumer complaints from various state attorneys general.

136. In approximately March 2009, Johnson, Savage, Pack, and Milkwick and certain other staff met in San Diego and discussed the excessive volume of consumer complaints.

137. In December 2011, Savage, Pack, and Milkwick discussed, among other things, chargebacks and BBB complaints during a Skorpios partnership meeting.

138. Even so, the excessive level of chargebacks and consumer complaints continued through at least the commencement of this action. For example, a June 2012 Sales/Operations Team Issue Log reported that sales representatives sometimes promise consumers more than the Defendants can reasonably fulfill, and an Operations Manager's Report from July 2012 recognized that the Defendants' inability to fulfill what sales representatives promise has a major effect on refunds and chargebacks. These reports demonstrate that the underlying cause of the ongoing consumer dissatisfaction remained uncorrected.

## **VIOLATIONS OF THE FTC ACT**

139. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

140. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

141. As set forth below, Defendants have engaged and continue to engage in violations

of Section 5(a) of the FTC Act in connection with the marketing and sale of their business development products and services.

## COUNT ONE – MISREPRESENTATION (RECOUPING PURCHASE PRICE AND EARNINGS)

### (By Plaintiff Federal Trade Commission)

142.    In numerous instances in connection with the telemarketing and sale of their products and services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase Defendants' business development products and services:

      a.      will recoup the cost of Defendants' products and services through business earnings or tax deductions;

      b.      will be able to transfer the cost of Defendants' products and services to their future businesses; or

      c.      are likely to earn substantial income.

143.    In truth and in fact, in numerous instances in which the Defendants have made the representations set forth in Paragraph 142 above, consumers who purchased the Defendants' products and services:

      a.      did not recoup those costs through business earnings or tax deductions;

      b.      could not transfer those costs to their future businesses; and

      c.      did not earn substantial income.

144.    Therefore, Defendants' representations as set forth in Paragraph 142 of this Complaint are false and misleading, and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

39

## COUNT TWO – MISREPRESENTATION (PRODUCTS AND SERVICES PROVIDED)

### (By Plaintiff Federal Trade Commission)

145.    In numerous instances in connection with the telemarketing and sale of their products and services, Defendants have represented, directly or indirectly, expressly or by implication, that they will provide various products and services to their customers, including but not limited to one or more of the following:

(a) unlimited access to tax or business advisors who will provide specialized expert advice tailored to the consumers' specific needs;

(b) individualized business plans tailored to the consumer's particular business; and

(c) specialized assistance necessary to develop and obtain business credit.

146.    In truth and in fact, in numerous instances in which the Defendants have made the representations set forth in Paragraph 145 above, Defendants did not provide the products and services they represented they would provide, including but not limited to: (a) unlimited access to tax or business advisors who will provide specialized expert advice tailored to the consumers' specific needs; (b) individualized business plans tailored to the consumer's particular business; and (c) specialized assistance necessary to develop and obtain business credit.

147.    Therefore, Defendants' representations as set forth in Paragraph 145 of this Complaint are false and misleading, and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT THREE – MISREPRESENTATIONS (AFFILIATION)

### (By Plaintiff Federal Trade Commission)

148.    In numerous instances in connection with the telemarketing and sale of their products and services, Defendants have represented, directly or indirectly, expressly or by implication, one or both of the following:

> a.    the Defendants are calling consumers on behalf of or at the direction of companies that recently sold consumers a business development product or service; and
>
> b.    consumers will recoup the money they already paid to other companies for business development products and services if they purchase additional products and services from the Defendants.

149.    In truth and in fact, in numerous instances in which the Defendants have made the representations set forth in Paragraph 148 above, the Defendants were not calling consumers on behalf or at the direction of companies that recently sold consumers a business development product or service, and consumers did not recoup the money they already paid to other companies for business development products and services after they purchased additional products and services from the Defendants.

150.    Therefore, Defendants' representations as set forth in Paragraph 148 of this Complaint are false and misleading, and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

151.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101 – 6108, which resulted in the adoption of the TSR, 16 C.F.R. Part 310.

152.     Defendants are "sellers[s]" and "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. §§ 310.2(aa), (cc), and (dd).

153.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

154.     The TSR requires telemarketers to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call: (1) the identity of the seller; (2) that the purpose of the call is to sell goods or services; and (3) the nature of the goods and services.  16 C.F.R. §§ 310.4(d)(1), (2), and (3).

155.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  Pursuant to Section 4(a) of the Telemarketing Act, 15 U.S.C. § 6103(a), the Attorneys General of the State of Florida and the State of New York are authorized to bring civil actions to enforce the TSR, and violations of the TSR constitute violations of FDUTPA, §§ 501.201 et seq. Fla. Stat., and of NY Exec. Law § 63(12) and GBL §§ 349 and 350.

## COUNT FOUR – MISREPRESENTATION (PERFORMANCE, EFFICACY, NATURE, ESSENTIAL CHARACTERISTICS)

### (By Plaintiffs Federal Trade Commission, State of Florida, and State of New York)

156.    In numerous instances in connection with the telemarketing offers to sell the Defendants' products and services, Defendants, directly or indirectly, expressly or by implication, have made representations regarding material aspects of the performance, efficacy, nature, or essential characteristics of their products and services, such as:

a.    consumers who purchase the Defendants' products and services will recoup the purchase costs through business earnings or tax deductions;

b.    consumers who purchase the Defendants' products and services will be able to transfer the purchase costs to their future businesses;

c.    consumers who purchase the Defendants' products and services are likely to earn substantial income;

d.    the Defendants will provide products and services to their customers including but not limited to one or more of the following:

(i) unlimited access to tax or business advisors who will provide specialized expert advice tailored to the consumers' specific needs;

(ii) individualized business plans tailored to the consumer's particular business; and

(iii) specialized assistance necessary to develop and obtain business credit.

157.    In truth and in fact, in numerous instances in which the Defendants have made the representations set forth in Paragraph 156 above:

a.      consumers who purchased the Defendants' products and services did not recoup the purchase price through business earnings or tax deductions;

b.      consumers who purchased the Defendants' products and services were not able to transfer those costs to their future businesses;

c.      consumers who purchased the Defendants' products and services did not earn substantial income;

d.      the Defendants did not provide products and services that they represented they would provide, including but not limited to:

(i) unlimited access to tax or business advisors who will provide specialized expert advice tailored to the consumers' specific needs;

(ii) individualized business plans tailored to the consumer's particular business; and

(iii) specialized assistance necessary to develop and obtain business credit.

158.    The Defendants' practices as alleged in Paragraph 156 therefore constitute deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(iii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

## COUNT FIVE – FAILURE TO DISCLOSE (SELLER'S IDENTITY, SALES PURPOSE OF CALL, AND NATURE OF SERVICES)

### (By Plaintiffs Federal Trade Commission, State of Florida, and State of New York)

159.    In numerous instances in connection with the telemarketing offers to sell the Defendants' products and services, Defendants, directly or indirectly, have failed to disclose promptly and in a clear and conspicuous manner to the person receiving the call:

a.      the identity of the seller;

44

b.      that the purpose of the call is to sell services; and

c.      the nature of those services.

160.    The Defendants' practice as alleged in Paragraph 159 is an abusive telemarketing practice that violates Sections 310.4(d)(1), (2) and (3) of the TSR, 16 C.F.R. §§ 310.4(d)(1), (2), and (3).

## COUNT SIX – FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT

### (By Plaintiff State of Florida)

161.    The allegations of paragraphs 1 through 138 above are incorporated as if set forth herein. Defendants' sales representatives made telemarketing calls to Florida consumers who had been identified as leads for the purpose of selling them the Defendants' products and services. In the telemarketing calls, the Defendants' sales representatives made various misrepresentations to these Florida consumers or failed to disclose material information to them, including::

a.      Misrepresenting the affiliation of The Tax Club Enterprise, expressly or by implication, by representing that (i) The Tax Club Enterprise representatives are calling consumers on behalf of or at the direction of a particular lead source, and (ii) The Tax Club Enterprise's programs are integral to implementing the business development services the consumer already purchased from the lead source;

b.      Misrepresenting, directly or by implication, that consumers must supplement the products and services they already purchased from The Tax Club Enterprise with additional products and services from The Tax Club Enterprise in order to establish a profitable business;

c.      Misrepresenting the purchase price of the products or services sold by The

Tax Club Enterprise through representing, directly or by implication, that: (i) consumers who purchase The Tax Club Enterprise's products and services can transfer those costs to their future businesses; (ii) consumers will earn enough money from their future business to recoup the purchase price; and (iii) consumers will be able to recoup the purchase price through deductions on their tax returns;

d.       Misrepresenting, directly or by implication, that purchasers of The Tax Club Enterprise's products and services will earn substantial income;

e.       Misrepresenting that consumers will not be able to establish a profitable business without the purchase of The Tax Club Enterprise's products and services, or, in many cases, more products and services from The Tax Club Enterprise, and that such purchases will establish a profitable business;

f.       Misrepresenting, directly or by implication, that The Tax Club Enterprise will provide various products and services to consumers, including but not limited to business entity formation, business credit development, individualized business planning, tax return preparation, tax advice, and personal consultation and business counseling; despite such representations, The Tax Club Enterprise does not provide the products and services as promised.

162.    In addition, the Defendants have committed acts and practices with respect to Florida consumers that are violations of the Telemarketing Act, 15 U.S.C. §§ 6101 – 6108, by virtue of the TSR, 16 C.F.R. Part 310, as set forth herein in Paragraphs 151 through 160, the violation of which is likewise a violation of FDUTPA.

163.    The Individual Defendants are personally liable for the unlawful acts and practices of the Corporate Defendants as each of the Individual Defendants, namely Johnson, Savage,

46

Pack, and Milkwick, have the authority and power to control or direct the conduct at issue herein of the Corporate Defendants and/or actually participated in and directed the conduct at issue herein of the Corporate Defendants.

164.    The Defendants' acts and practices as set forth herein were misleading, deceptive and unconscionable and likely to mislead a consumer acting reasonably, and consumers within the State of Florida and elsewhere were actually misled by the Defendants' acts and practices recited herein.

165.    As a result of Defendants' unlawful acts and practices in violation of FDUTPA and the TSR, Florida consumers have suffered and will continue to suffer substantial injury, including actual damages. Florida consumers did not receive the products and services that Defendants represented and promised to them.

## COUNT SEVEN – NEW YORK EXECUTIVE LAW SECTION 63(12)

### (By Plaintiff State of New York)

166.    As set forth in Paragraphs 1 through 138 above, which allegations are incorporated as if set forth herein, the Corporate and Individual Defendants have committed acts and practices that constitute repeated and persistent fraudulent and illegal conduct in violation of NY Exec. Law § 63(12), including:

a.    Misrepresenting the affiliation of The Tax Club Enterprise, expressly or by implication, by representing that (i) The Tax Club Enterprise representatives are calling consumers on behalf of or at the direction of a particular lead source, and (ii) The Tax Club Enterprise's programs are integral to implementing the business development services the consumer already purchased from the lead source;

47

b.      Misrepresenting, directly or by implication, that consumers must supplement the products and services they already purchased from The Tax Club Enterprise with additional products and services from The Tax Club Enterprise in order to establish a profitable business;

c.      Misrepresenting the purchase price of the products or services sold by The Tax Club Enterprise through representing, directly or by implication, that: (i) consumers who purchase The Tax Club Enterprise's products and services can transfer those costs to their future businesses; (ii) consumers will earn enough money from their future business to recoup the purchase price; and (iii) consumers will be able to recoup the purchase price through deductions on their tax returns;

d.      Misrepresenting, directly or by implication, that purchasers of The Tax Club Enterprise's products and services will earn substantial income;

e.      Misrepresenting that consumers will not be able to establish a profitable business without the purchase of The Tax Club Enterprise's products and services, or, in many cases, more products and services from The Tax Club Enterprise, and that such purchases will establish a profitable business;

f.      Misrepresenting, directly or by implication, that The Tax Club Enterprise will provide various products and services to consumers, including but not limited to business entity formation, business credit development, individualized business planning, tax return preparation, tax advice, and personal consultation and business counseling; despite such representations, The Tax Club Enterprise does not provide the products and services as promised;

g.      Committing acts and practices that are a violation of the Telemarketing

48

Act, 14 U.S.C. §§ 6101 – 6108, by virtue of the TSR, 16 C.F.R. Part 310, as set forth herein in Paragraphs 151 through 160, the violation of which is likewise a violation of NY Exec. Law § 63(12).

## COUNT EIGHT – NEW YORK GENERAL BUSINESS LAW ARTICLE 22-A

### (By Plaintiff State of New York)

167.   As set forth in Paragraphs 1 through 138 above, which allegations are incorporated as if set forth herein, the Corporate and Individual Defendants have committed acts and practices that are deceptive business practices and false advertising in violation of GBL §§ 349 and 350, including:

    a.   Misrepresenting the affiliation of The Tax Club Enterprise, expressly or by implication, by representing that (i) The Tax Club Enterprise representatives are calling consumers on behalf of or at the direction of a particular lead source, and (ii) The Tax Club Enterprise's programs are integral to implementing the business development services the consumer already purchased from the lead source;

    b.   Misrepresenting, directly or by implication, that consumers must supplement the products and services they already purchased from The Tax Club Enterprise with additional products and services from The Tax Club Enterprise in order to establish a profitable business;

    c.   Misrepresenting the purchase price of the products or services sold by The Tax Club Enterprise through representing, directly or by implication, that: (i) consumers who purchase The Tax Club Enterprise's products and services can transfer those costs to their future businesses; (ii) consumers will earn enough

49

money from their future business to recoup the purchase price; and (iii) consumers will be able to recoup the purchase price through deductions on their tax returns;

d.     Misrepresenting, directly or by implication, that purchasers of The Tax Club Enterprise's products and services will earn substantial income;

e.     Misrepresenting that consumers will not be able to establish a profitable business without the purchase of The Tax Club Enterprise's products and services, or, in many cases, more products and services from The Tax Club Enterprise, and that such purchases will establish a profitable business;

f.     Misrepresenting, directly or by implication, that The Tax Club Enterprise will provide various products and services to consumers, including but not limited to business entity formation, business credit development, individualized business planning, tax return preparation, tax advice, and personal consultation and business counseling; despite such representations, The Tax Club Enterprise does not provide the products and services as promised;

g.     Committing acts and practices that are a violation of the Telemarketing Act, 14 U.S.C. §§ 6101 – 6108, by virtue of the TSR, 16 C.F.R. Part 310, as set forth herein in Paragraphs 151 through 160, the violation of which is likewise a violation of GBL §§ 349 and 350.

## RELIEF DEFENDANT

## COUNT NINE – ILL-GOTTEN GAINS

### (By Plaintiffs Federal Trade Commission, State of Florida, and State of New York)

168.     Relief defendant Sandra Savage has received, directly or indirectly, funds and assets from the Defendants that are traceable to funds obtained from Defendants' customers

through the unlawful acts or practices described herein.

169.     Relief defendant Sandra Savage has no legitimate claim to the ill-gotten funds or benefits she received and will be unjustly enriched if she is not required to disgorge the funds or the value of benefits she received as a result of the Defendants' unlawful acts or practices.

170.     By reason of the foregoing, relief defendant Sandra Savage holds funds or assets in constructive trust for the benefit of Defendants' customers.

## CONSUMER INJURY

171.     Consumers have suffered and will continue to suffer substantial injury as a result of the Defendants' violations of the FTC Act, the Telemarketing Act, the TSR, FDUTPA, the NY Exec. Law, and the GBL.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

172.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and prejudgment interest to prevent and remedy any violation of any provision of law enforced by the FTC.

173.     Section 19 of the FTC Act, 15 U.S.C. § 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of

ill-gotten monies, and prejudgment interest.

174.    Florida Statutes Section 501.207 authorizes this Court to issue appropriate orders granting legal, equitable or other appropriate relief for Defendants' violations of FDUTPA and the TSR.

175.    NY Exec. Law § 63(12) and GBL §§ 349 and 350 authorize this Court to issue appropriate orders granting legal, equitable or other appropriate relief for Defendants' violations of NY Exec. Law § 63(12), GBL §§ 349 and 350, and the TSR.

## PRAYER FOR RELIEF

Wherefore, plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(d) of the Telemarketing Act, 15 U.S.C. § 6105(b), plaintiff State of Florida, pursuant to Florida Statutes Section 501.207, and plaintiff State of New York, pursuant to NY Exec. Law § 63(12) and GBL §§ 349 and 350, and as authorized by the Court's own equitable powers, request that the Court:

A.    Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, a temporary restraining order, a preliminary injunction, an order freezing assets, immediate access, and appointment of a receiver;

B.    Enter a permanent injunction to prevent future violations of the FTC Act, the Telemarketing Act, the TSR, FDUTPA, the NY Exec. Law, and the GBL by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the Telemarketing Act, the TSR, FDUTPA, the NY Exec. Law, and the GBL, including but not limited to, rescission or

52

reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten

monies, and prejudgment interest;

      D.     Award civil penalties in an amount up to $10,000 per transaction pursuant to

Florida Statutes Section 501.2075 and up to $15,000 per transaction pursuant to Florida Statutes

Section 501.2077 for the willful acts and practices of the Defendants in violation of FDUTPA;

      E.     Award civil penalties in an amount up to $5,000 for each violation of GBL §§ 349

and 350, pursuant to GBL § 350-d; and

      F.     Award Plaintiffs attorneys' fees and the costs of bringing this action, as well as

such other and additional relief as the Court may determine to be just and proper.

<div style="margin-left: 40%;">

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

WILLIAM H. EFRON
Regional Director
Northeast Region

_Darren H. Lubetzky_
Darren H. Lubetzky
Ann F. Weintraub
Savvas S. Diacosavvas
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2829
Fax: (212) 607-2822
Email: dlubetzky@ftc.gov
Email: aweintraub@ftc.gov
Email: sdiacosavvas@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

</div>

Dated: April 8, 2013

Dated: 4/8/13

PAMELA JO BONDI,
ATTORNEY GENERAL,

Robert G. Clements
Office of the Attorney General
135 W. Central Blvd., Suite 1000
Orlando, Florida 32801
Telephone: (407) 234-0833
Facsimile: (407) 245-0365
Email: Robert.Clements@myfloridalegal.com

Attorney for Plaintiff
STATE OF FLORIDA

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL,

Dated:

_____

Judy S. Prosper
Guy H. Mitchell
Jane M. Azia
Office of the Attorney General
Westchester Regional Office
101 East Post Road
White Plains, New York 10601
Telephone: (914) 422-8755
Facsimile: (914) 422-8706
Email: Judy.Prosper@ag.ny.gov
Email: Guy.Mitchell@ag.ny.gov
Email: Jane.Azia@ag.ny.gov

Attorney for Plaintiff
STATE OF NEW YORK

PAMELA JO BONDI,
ATTORNEY GENERAL,

Dated: _____

Robert G. Clements
Office of the Attorney General
135 W. Central Blvd., Suite 1000
Orlando, Florida 32801
Telephone: (407) 234-0833
Facsimile: (407) 245-0365
Email: Robert.Clements@myfloridalegal.com

Attorney for Plaintiff
STATE OF FLORIDA

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL,

Dated: April 8, 2013 _____

Judy S. Prosper
Guy H. Mitchell
Jane M. Azia
Office of the Attorney General
Westchester Regional Office
101 East Post Road
White Plains, New York 10601
Telephone: (914) 422-8755
Facsimile: (914) 422-8706
Email: Judy.Prosper@ag.ny.gov
Email: Guy.Mitchell@ag.ny.gov
Email: Jane.Azia@ag.ny.gov

Attorney for Plaintiff
STATE OF NEW YORK

54